ALBRECHT et al. v. NATIONAL LABOR RELATIONS BOARD (CARNEGIE–ILLINOIS STEEL CORPORATION, Intervenor).

No. 10012.

United States Court of Appeals
Seventh Circuit.

May 2, 1950.

Abraham W. Brussell, Milton I. Shadur, Chicago, Ill. (Milton L. Ray, Chicago, Ill., Goldberg, Devoe & Brussell, Chicago, Ill., of counsel), for petitioners.

David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Norton J. Come, Attorney, National Labor Relations Board, Washington, D. C., Frederick U. Reel, Maurice Alexandre, Attorneys, National Labor Relations Board, Washington, D. C., for respondent.

Paul R. Conaghan, Chicago, Ill., Knapp, Cushing, Hershberger & Stevenson, Chicago, Ill., of counsel, for intervenor.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioners, Foreman's Association of America, Chapter 44, and 82 individuals formerly employed, as supervisory employees, by Carnegie-Illinois Steel Corporation, hereinafter referred to as Carnegie, seek to set aside, in part, an order of the National Labor Relations Board, which granted relief as to one petitioner and dismissed the complaint as to all others, the Board finding that there had been no unfair labor practices on the part of Carnegie in discharging the individual petitioners. The employer has been permitted to intervene and has filed a motion to dismiss the proceeding for want of jurisdiction.

Carnegie's motion rests on its contention that petitioners are not "persons aggrieved by a final order of the Board," within the meaning of Section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), and that, consequently, this court is without jurisdiction to entertain their petition for review of the order dismissing the unfair labor practices complaint. Carnegie

urges that "persons aggrieved," as that term is used in Section 10(f), includes only persons aggrieved by a final order prohibiting them from engaging in unfair labor practices, and does not embrace those aggrieved by a final order dismissing an unfair labor practice complaint. Petitioners, however, contending that the language conclusively negatives the existence of any such limitation, insist that they are "persons aggrieved," within the meaning of the statute, and, as such, entitled to prosecute in this court their petition to review the order dismissing the complaint.

Section 10(f), provides that "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in the * * * Court of Appeals * * * by filing in such a court a written petition praying that the order of the Board be modified or set aside." A literal interpretation of this language would seem to establish that the court has jurisdiction, for it is obvious that the Board's dismissal of the unfair labor practices complaint constitutes a "final order * * * denying * * * the relief sought" and that petitioners, Carnegie's discharged employees, are "persons aggrieved" thereby.[1] The employer, however, insists that this interpretation would lead to results beyond the intention of Congress.

Carnegie urges that the Congress, when it enacted the law, did not thereby intend to bestow any private right of action upon employees as such, but rather to create only rights of a purely public nature, enforceable only by the Board. This argument is based largely on an excerpt from the House Committee Report, 74th Cong., 1st Sess., Report No. 1147, page 24, as follows: "No private right of action is contemplated. Essentially the unfair labor practices listed are matters of public concern, by their nature and consequences, present or potential; the proceeding is in the name of the Board, upon the Board's formal complaint." This quotation, however, considered in its relation to the rest of the report, makes it clear that the Committee, when it said "No private right of action is contemplated," was referring to the right to institute an unfair labor practice proceeding, and did not mean that a person aggrieved by a final order of the Board entered at the conclusion of such a proceeding did not have a right to secure judicial review of that final order, as provided for in Section 10(f) of the Act.[2]

Nor is this conclusion at all inconsistent with the decisions of this court, in Blankenship et al., v. Kurfman et al., 7 Cir., 96 F.2d 450, 454, and Stewart Die Casting Corp. v. N.L.R.B., 7 Cir., 132 F.2d 801, to the effect that the Act does not create, for employees, rights which are enforceable independently of Board action, for here the petitioners are not acting independently of the Board but are seeking review of a final order entered by the Board.[3] And that the courts

---

1. It might be contended (although Carnegie has not done so) that even had Carnegie been found guilty of engaging in unfair labor practices, the reinstatement of the petitioners, with or without back pay, would still have been wholly discretionary with the Board, to which is entrusted the determination of the means by which an unfair labor practice is to be rectified, 29 U.S.C.A. § 160(c), and that, consequently, petitioners were not necessarily aggrieved by the Board's dismissal of the complaint against Carnegie. However, in view of the fact that the Board almost invariably orders the reinstatement of employees whose dismissal constituted an unfair labor practice, this would hardly seem to warrant a holding that the court is without jurisdiction in this case.

2. It might be observed that, although Carnegie's contention is that no private right of action by *employees* was contemplated by Congress, the Committee report states merely, "*No private right of action is contemplated*" (Emphasis supplied), which, if Carnegie's interpretation of the meaning of those words should be adopted, would bar judicial review of a Board order by an employer as well as by his employees and thus render meaningless the statutory provision for judicial review contained in Section 10 (f).

3. The cases cited by Carnegie which hold that the courts lack jurisdiction to review a Board order directing an election in a representation proceeding under Section 9 (c), N. L. R. B. v. International Brotherhood of Electrical Workers, 308 U.S.

have not accepted Carnegie's contention is apparent from Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 266, 60 S.Ct. 561, 564, 84 L.Ed. 738, in which the Supreme Court characterized the "opportunity afforded to private persons by Section 10(f)" as an "opportunity * * * to *contest* a final order of the Board, not to *enforce* it," and the statement by this court, in Stewart Die Casting Co. v. N.L.R. B., 7 Cir., 132 F.2d 801, 804, that "The employee is, by this section (Sec. 10(f)), given an opportunity to *contest* the order of the Board." (Emphasis supplied.)

Similarly, the intervenor's argument that the purpose of Section 10(f) was to provide for judicial review of orders prohibiting unfair labor practices but not of orders dismissing unfair labor practice complaints finds no support in the language of the Act itself. Indeed, Section 10(f) expressly provides that judicial review may be had of a final order *granting or denying* the relief sought. Since an order dismissing an unfair labor practices complaint is quite obviously a final order *denying* the relief sought, it is evident that to adopt Carnegie's contention that such an order is not subject to review would be equivalent to striking the words "or denying" from the Act. The courts have accordingly taken the view that Section 10(f) means exactly what it says,—that Section 10(f) gives them jurisdiction to review a Board order dismissing a complaint. Jacobsen v. N.L. R.B., 3 Cir., 120 F.2d 96, 100; Lincourt v. N.L.R.B., 1 Cir., 170 F.2d 306, 307; General Drivers, Chauffeurs and Helpers Local 886, A. F. L., v. N.L.R.B., 10 Cir., 179 F.2d 492. Typical of the attitude of these courts is that of the Court of Appeals for the Third Circuit, which stated, in the Jacobsen case, supra, that "The Board having * * * entered a final order dismissing the complaint, we are of the opinion that this

court, pursuant to the provisions of Section 10(f) of the Act * * * has jurisdiction upon the petition of those aggrieved by that order to review it." The Ninth Circuit, in Anthony v. N.L.R.B., 132 F.2d 620, has taken the contrary view, but its decision, which was rendered upon petitioner's request for an order granting him leave to file a petition for review *in forma pauperis*, has not been followed in any other circuit.

▮ In short, petitioners in this case are merely seeking to follow the procedure which both the Supreme Court and this court have indicated is afforded them by the provisions of Section 10(f) of the Act, —an opportunity to contest, (though not to enforce), a final order of the Board. To deny them this right, to adopt the intervenor's contention that only an order prohibiting unfair labor practices (i. e., an order granting the relief sought in the complaint) is subject to review would be to ignore the clear and unambiguous statutory provision that an aggrieved person may secure review of "a final order of the Board granting or denying * * * the relief sought." Consequently, the intervenor's motion to dismiss for lack of jurisdiction is denied.

The complaint was based upon a charge by petitioners and others that Carnegie had violated the Act in discharging and refusing to reinstate the individual petitioners. A trial examiner conducted hearings. The Board found the facts to be substantially as set forth in the examiner's report but concluded that, though the examiner had believed the discharges in violation of the Act, they were, in fact, reasonable and in no wise violative of the Act.

The facts out of which this controversy arose are reflected to some extent by the decision of this court in Keserich v. Carnegie-Illinois Steel Corporation, 163 F.2d 889,

413, 60 S.Ct. 306, 84 L.Ed. 354, or a Board certification of bargaining representatives under the same section, A. F. L. v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347, or a decision of the Board's General Counsel not to issue an unfair labor practices complaint in a particular case, Lincourt v. N. L. R. B., 1

Cir., 170 F.2d 306, 307, are not relevant to the question presented in this case, for, irrespective of the ultimate effect of the orders, certifications, or decisions with which they dealt, none of them involved a "final order" of the Board, within the meaning of Section 10 (f).

wherein the court concluded that Keserich, one of the present petitioners, had been discharged for legitimate cause. · We shall accordingly abbreviate our statement somewhat in order to avoid repetition.

On November 28, 1945, the United Steelworkers of America, rank-and-file employees of Carnegie, called a strike for January 14, 1946. The Carnegie plant, located in Gary, Indiana, covers some 14,000 acres. It has some 16,000 employees and 1500 supervisory employees. Its physical property includes a coke plant, blast furnaces, open hearth furnaces, central mills, west mills and maintenance shops. The coke plant includes some 15 batteries containing 1000 coke ovens. The coke produced is used in 12 blast furnaces, which, with 40 stoves, form the largest blast furnace installation in the world. Through these furnaces pass coke, iron, limestone and air, heated to 1000 degrees Fahrenheit. The resulting molten iron is then conveyed to open hearth furnaces, of which there are 53, housed in five different buildings. In them, under proper treatment, the molten iron is converted into molten steel and then solidified into ingots, soaked and reheated. The steel is then rolled in the central mills and steel products in turn are shaped to customers' specifications in the west mills. The plant contains various supplemental installations, in addition to the main divisions. Some 250 miles of railroad track and 30 miles of roadways serve the coke ovens, furnaces and mills. There are many miles of pipe for water supply, mains for gas transmission and heating equipment for the plant and buildings and other essential physical structures.

The evidence is replete that explosion and permanent injury to many millions of dollars worth of property are threatened every time the operation is shut down. Then, too, it is necessary at all times to operate three coke oven batteries, in order to prevent destruction of the other ovens as well as to produce gas for the city of Gary. Suffice it to say, that, when the steelworkers voted to strike, it became incumbent upon Carnegie, in order to preserve its property, to keep approximately 800 men in the plant constantly to prevent explosion, fire and other catastrophies which would be constantly threatening if precautions were not taken to prevent them. Accordingly it conferred with the steelworkers concerning the problem. These employees agreed that steps should be taken to preserve the property and to prevent damage thereto causing long delays and great expense in resuming production, but, although they had no closed-shop contract with Carnegie, insisted that only members of the union should be employed. It seems that about 800 of the 1500 supervisory employees belonged to Foreman's. The others were nonunion. Accordingly, the employer took the position that it had no right, in the absence of contract to the effect, to agree to employ only union members or to refuse to employ nonunion men. Thus the matter came to a deadlock, the steelworkers advising Carnegie that they would establish picket lines around the plant on January 12. However, the strike was postponed until January 21, 1946, and on Sunday, January 20, a final meeting between the steelworkers and Carnegie took place. The employer agreed to turn over to the steelworkers the detailed schedules of what it proposed to do in the plant under strike conditions, provided the rank-and-file employees withdrew their insistence upon barring all non-union employees from performing emergency duties. However, no agreement was reached.

The Foreman's Association of supervisory employees had, in early January, adopted a policy to the effect that members would perform no rank-and-file work but rather only their normal duties and would work only during their normal scheduled hours, except in case of emergencies involving protection of equipment and maintenance of essential services to the community; that they were opposed to staying in the mill twenty-four hours a day during the strike and would not attempt to cross steelworkers' picket lines, if passage into the plant was prevented. In the next few days following this declaration, the employer interviewed each of the supervisory employees including petitioners, individually or in groups, advising them that it appeared that rank-and-file employees might not be

available for emergency duty. All were asked whether they would remain on the premises and help protect the plant from damage as well as provide utility service for the city of Gary. Some petitioners and certain others agreed or made no objection, while still others either refused to commit themselves, gave conditional assent or refused. On the second day preceding the day of the strike, January 21, Carnegie instructed the petitioners and its other supervisory employees to report to the plant on Sunday, January 20. It instructed them to bring their work clothes and toilet articles. Most of them reported with proper clothing but a few failed to report or came empty handed. The employer furnished clothes to those who did not bring them, or provided transportation to and from their homes to enable them to obtain their own necessary clothes. All of them were requested to remain in the plant, for the sole purpose of protecting it and furnishing utility service to the city. Many of them, however, were excused from emergency duties because of ill health or personal inconvenience. Others either expressly agreed to help or voiced no objection or gave conditional assent; some refused. The 82 petitioners either failed to report for duty, or, having reported, refused to perform or to continue to perform emergency duty during the strike, and left the plant singly or in groups. During Sunday and Monday a few of them worked. Some of them left Sunday evening, prior to receiving any assignment or without performing any of their assigned duties. Some worked part of Sunday and Monday and left Monday evening. A relatively few worked longer but left prior to the termination of the rank-and-file strike.

Thereafter, prior to the conclusion of the strike, on February 15, 1946, Carnegie sent to each supervisor who had refused to obey instructions to perform emergency duty, a suspension notice in which he was given an opportunity to appear and present facts which would promote a determination of whether his suspension should be followed by reinstatement or by discharge. All were advised that the factors which would determine the decision would include: (1), whether the supervisor had promised to perform emergency duty, (2), whether he obeyed his instructions to perform emergency duty, (3), if not, whether his failure to obey was excusable, and (4), whether there were other mitigating circumstances. After considering the facts developed at these interviews, Carnegie reinstated certain employees, some of them members of the Foreman's Union, some not, some of them with back pay and others without. But the 82 petitioners were discharged. The union thereupon complained to the Board and in pursuance of the union's charge the Board filed the complaint which resulted in the order now on review.

On final hearing, the Board, having considered the intermediate report of the trial examiner and the record, stated that "to the extent that they are consistent with this decision and order, the Board adopts the findings and conclusions" of the examiner. The latter had found that respondent had discriminatorily discharged supervisory employees and discriminatorily demoted one Rudolph Mihelic, thereby violating Section 8(3) and 8(1) of the Act; but the Board declared "We do not agree with these findings or recommendations, except as to Mihelic." Concerning the work assigned to the supervisory employees, the Board found: "In every case, however, the purpose of the work assignment was solely to prevent serious damage to plant equipment during the steelworkers' strike and to maintain essential services to the city of Gary. Apart from this, the Respondent made no effort during the rank-and-file strike to continue its normal production operations. Assuming, without deciding, that in all cases the supervisors, in refusing to work, engaged, as the Examiner found, in concerted activities, we do not agree that on the facts in this case such activities are protected by the Act." It made a specific finding as follows: "We find that, whatever the reason for their action, under the special circumstances of this case, the supervisors' failure to report for, or remain at, work was such a serious breach of their duty to the Respondent as to remove them from the protection of the Act." The Board also found that "the complainants

owed a duty to the Respondent, inherent in their position as supervisors, to comply with all reasonable instructions designed to protect the Respondent's physical plant from imminent damage or destruction. Certainly, if the supervisors had been discharged for wilfully or negligently damaging the Respondent's blast furnaces or coke ovens, we would have no hesitation in finding that such discharge was for good cause. It would have been no defense that such action was taken in concert with other supervisors or in furtherance of a strike by supervisors or other employees. The case is no different in principle if, as in the case at bar, the supervisors, knowing that the furnaces and ovens, unless properly banked or closed down, would suffer serious damage, deliberately and concertedly, and contrary to the employer's instructions, refuse to cooperate with other supervisors in the work necessary to prevent such damage. Steelworkers itself recognized the exigency of the situation and the need for 'standby' work during the rank-and-file strike, agreeing to permit such work to be done, provided that it was done only by members of Steelworkers. And the overwhelming majority of the supervisors, both members and non-members of the Association, remained at their posts throughout Steelworkers' strike. It is true that in this case insofar as appears from the record, the Respondent was able to avoid damage to its plant, due, presumably to the efforts of those supervisors who remained at work. However, that fact does not, in our opinion, mitigate the seriousness of the breach of discharged supervisors in this case." The Board concluded that "In the instant case, in view of the peculiar susceptibility of the Respondent's plant to crippling damage from an abrupt shut-down of its operations, the Respondent was entitled to have in supervisory positions persons on whom it could depend for emergency duty to forestall destruction of key plant facilities, and it was not unlawful for it to discharge those of its supervisors who, by walking out or failing to report during the rank-and-file strike, demonstrated their lack of dependability in an emergency." That the Board was considering only the special facts presented is apparent from its language as follows: "For all these reasons, we find that the 82 supervisors were not unlawfully discharged or suspended. Our finding is not to be construed as a holding that any action whatsoever contrary to his employer's economic interests through a strike or otherwise, will cause a supervisor to forfeit the protection of the Act prior to amendment. Our decision in the case at bar is to be construed as confined to the particular facts of the supervisors' conduct involved therein, which conduct constituted a threat to the respondent's physical plant." After ordering Mihelic reinstated, the Board dismissed the complaint insofar as it related to the other employees.

We have given careful consideration to the record and think there is no dispute at all as to any of the facts found by the Board. There is no question that it had long been recognized at Carnegie and in the steel industry generally that in all cases of emergency it is most essential for both employer and employee to maintain the plant without damage. Consequently supervisory employees have, in times past at Carnegie and elsewhere in the industry, in case of strike by rank-and-file workers, performed their recognized duty to help the employer preserve and maintain the property. As Judge Minton, now Mr. Justice Minton, said in Keserich v. Carnegie-Illinois Steel Corporation, 7 Cir., 163 F.2d 889, 890 "For this conduct, the petitioner was discharged. The basis of the respondent's action was such as a fair-minded person might act upon. It was not a mere excuse or an arbitrary action to avoid the provisions of the statute." We said there and we think now that respondent had ample cause to discharge the supervisory employees. The following quotation is pertinent: "An emergency had made it necessary for the respondent to look to the petitioner-foreman as one upon whom it could rely to protect its property. This was not a change of status but an enlargement of the duties and responsibilities of a foreman due to an emergency." In other words, the evidence of record here is such as amply to justify the Board's conclusion unless we can find some error of law.

Our review in such a case as this has relatively narrow limitations. Section 10 (f) of the Act provides that "* * * the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." As we said in N.L.R.B. v. Illinois Tool Works, 153 F.2d 811, 816: "* * * it is the function of the Board to weigh the conflicts which arise from time to time out of the exercise of those rights and to determine in each case whether the interest of the employees or the interest of the employers should be held paramount, see Republic Aviation Corp. v. N.L.R.B., supra [324 U.S. 793, 65 S.Ct. 982, 157 A.L.R. 1081]." We think this language is fully sustained by the announcement of the Supreme Court in N.L.R.B. v. Stowe Spinning Company, 336 U.S. 226, 69 S.Ct. 541. See also N.L.R.B. v. Lake Superior Lumber Corporation, 6 Cir., 167 F.2d 147. The Board is charged by congressional act with the duty and the power to adjust conflicts and interests between employer and employee. In Securities and Exchange Comm. v. Central-Illinois Securities Corp. et al., 338 U.S. 96, 69 S.Ct. 1377, 1393, the court said: "Administrative determinations of policy, often based upon undisputed basic facts, in an area in which Congress has given the agency authority to develop rules based upon its expert knowledge and experience, are exemplified by Securities and Exchange Commission v. Chenery Corp., supra [332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995]." Our question, then, is, first, whether upon review of the record, there is adequate evidence to justify the findings of fact and if there is, whether the order entered upon those facts is in accord with the law.

■ Bearing in mind the function of the Board initially to settle conflicts in the administration of the relationship between employer and employee, we find nothing in the finding and conclusions which violates the act or goes beyond the limitations of the authority granted by Congress to the Board. The Board, having found petitioners at fault, concluded, within the law, that when the employer discharged employees for failure to perform their duty it did not commit unfair labor practices. As we said in Keserich v. Carnegie-Illinois Steel, supra, cause for discharge should be such as a fair minded person may act upon and if the discharge is not arbitrarily taken with a purpose or as an excuse to avoid the statute, it is based upon sufficient cause. The Supreme Court in N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, said: "* * * The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." In C. G. Conn, Limited, v. N.L.R.B., 108 F.2d 390, 397, commenting upon the employer's right to discharge, this court used this language: "The events preceding the discharges, heretofore related, lead almost undeniably to the conclusion that the men were discharged because of their insistence upon working under their own terms, which they had been advised were unacceptable to the employer. The conclusion in this respect is such as to refute any circumstances to the contrary. For the reasons stated, we think petitioner was within its rights in discharging the employees in question and that their status as employees was thereby destroyed."

■ We conclude that the evidence justified the findings of the Board and that the order entered in pursuance of the findings was not arbitrary or unreasonable. Accordingly the petition to review and set aside the order is denied.