**NATIONAL LABOR RELATIONS BOARD**
**v. TENNESSEE COACH CO.**
No. 11238.

United States Court of Appeals
Sixth Circuit.
July 9, 1951.

Sidney Sherman, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, and Irving M. Herman, all of Washington, D. C., on the brief), for petitioner.

Charles D. Snepp, Knoxville, Tenn. (Charles D. Snepp, Knoxville, Tenn., on the brief; Anderson & Snepp, Knoxville, Tenn., of counsel), for respondent.

Before ALLEN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of an order requiring the Tennessee Coach Company to reinstate an employee, Homer F. Fritts, on the ground that it was guilty of an unfair labor practice in discriminating against him through discharging him for the purpose of discouraging membership in a labor organization. Title 29 U.S.C.A. § 158(a)(3). The Board further ordered respondent to cease and desist from discouraging membership in any labor organization by discrimination as to hire or tenure of employment; from interrogating its employees as to union activities; from threatening to sell its operations in the event of union organization of its employees; from interfering with, restraining, or coercing its employees in any other manner in respect to their rights under Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157; and to post appropriate notices.

The Tennessee Coach Company, with its principal place of business in Knoxville, Tennessee, is a common carrier engaged in the transportation of passengers in the State of Tennessee, as well as in interstate commerce with Georgia, Virginia, and West Virginia. In December, 1946, the

union in this case, Amalgamated Association of Street Electric Railway & Motor Coach Employees of America, Local Division 1423, affiliated with the American Federation of Labor, began organizing the company's drivers; and on September 1, 1947, commenced organizing its maintenance employees. Subsequently, several meetings were held by the representatives of the union and the company to discuss the appropriateness of the two separate unions, and, as a result of these conferences, on November 12, 1947, a consent election was agreed upon for a single system-wide unit of drivers and maintenance employees. Prior to the election and during October and November, 1947, the company discharged from its employment J. B. Arwood, Homer F. Fritts, W. M. Baker, and C. E. Dykes, all maintenance employees. Thereafter, on December 3, 1947, the union filed its original charge with the Board, claiming that respondent had discharged the aforesaid employees because of union activities, later amending its charge so as to eliminate employee Dykes from the charge.

Subsequently, on December 9, 10, 11, and 12, 1947, an election was conducted by the Board, with the result that 190 votes were cast against the union, and 67 votes in its favor. Neither party filed objections to the election, and on December 24, 1947, the union's petition for certification as bargaining agent was dismissed by the Board.

The trial examiner found that respondent was not guilty of any discrimination in discharging any of the three above mentioned employees. The Board found that two of the discharges were not discriminatory within the meaning of Section 8(a) (3) of the Act, 29 U.S.C.A. § 158(a)(3), but that the discharge of Fritts was discriminatory. Both the examiner and the Board agreed that the company had interfered with and coerced its employees in violation of Section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1).

Respondent contends that Fritts was properly discharged for cause; and that it was not guilty of any interference with or coercion of its employees in the exercise of their rights to self-organization, collective bargaining, and concerted activities for the purpose of such bargaining or other mutual aid or protection.

From the evidence, it appears that during the union's campaign to organize the employees, Fritts, during working hours, solicited Carl Horner and Norman Fred Kitts, two of respondent's employees, to join the union. These employees at the time were boys between 17 and 18 years old. Employee Dykes was engaged in the same solicitation. When the boys did not agree to join the union, Dykes told Horner that he ought to join then while he could make it easier for himself; that if he joined at that time, it would cost only $2.00, but that if he waited until they got organized, it would cost him $50.00; and that "If you don't join now, they will make it so hard on you you will have to join or quit work when they do organize it." Horner said he replied to Dykes that he "didn't think there was a closed shop in Tennessee," but that Dykes, in answer, stated that while there was not, at that time, "they were going to * * * put in some new laws to make a closed shop."

Horner also testified that Fritts came over to the place where he worked and told him "about the same as Dykes said. Told me if I didn't join it, it would make it hard on me"; that they would make it so hard on him he would have to go somewhere else to work; that he would have to quit or join the union; and that he would have twelve to sixty days to join; that Fritts made these threats to him while he was working in the course of his employment for respondent company; and that they interfered with his work because he would have to stop and listen to them. During the period Fritts was making these statements with regard to joining the union, Horner was working one night under one of the buses, when Fritts, operating another bus, let it "get away from him" and crashed into the one under which Horner was working, and, as Horner said, came very close to running over him. With reference to this incident, Fritts testified that Horner "didn't lack that much of getting killed (indicating)."

Kitts testified that while he was working one night at respondent's place of business, Fritts came up and asked him if he would join the union; that he told him no; that Fritts then told him that it would be best to join the union; that it would cost him less then than later; that Fritts would make it hard on him if he did not join; and that they would make it so hard on him he couldn't work there. Kitts replied that he would quit first. He testified that he reported Fritts' threats to employee Mallonee, a night shift foreman, and asked him whether he had to join the union, and that Mallonee told him he was free to join or not to join. Mallonee, in reply to a question as to whether Kitts and Horner showed any concern over the threats, testified that "they were scared their job would be no good if the union went through and that they couldn't do their work because the boys were talking to them about getting run off if they got the union in and they didn't join it; and they were young fellows and they didn't understand what it was all about." Mallonee further stated that he noticed that Kitts and Horner were being interfered with and that their work was not being done as efficiently as it had been before.

After Kitts and Horner had reported the foregoing statements and threats to their foreman, shop superintendent Davis called Fritts to his office; charged him with threatening the boys; and stated that he did not intend to stand for such conduct, and that the election for the union was going to be run fair and square. He further told Fritts that whether he belonged to the union or not, he was going to fire him for making those statements and threats to the boys.[1]

The trial examiner made findings in accord with the above testimony; and the Board affirmed them except as to the conclusion that Fritts told the two boys that delay in joining the union would result in their being obliged to pay a much higher initiation fee. On this point, the Board said there was not sufficient evidence to support such finding. We are of the opinion that all the credible evidence does support this finding. In his findings, the trial examiner stated that because Kitts' testimony was at variance in several material aspects with a statement given by him to a field examiner of the Board, he placed no reliance on it, but based his findings on the testimony of Horner and Mallonee. The testimony of these two men would amply support the trial examiner's findings; but we do not see why Kitts' testimony should be rejected. The statement in question was prepared by a field examiner of the Board and presented to Kitts for his signature. He stated that he signed it without having read it through because he was in a hurry to join a friend who was waiting for him. His testimony contradicted the facts appearing in the statement; and he said that he did not know whether the statement set forth correctly what he told the field examiner. Apparently he did not read the statement through while on the witness stand. At that time, it was marked only for identification. The field examiner who prepared the statement was present at the hearing but did not testify. In view of these circumstances, the statement can not be considered as vitiating Kitts' undisputed testimony. On an examination of the record on this point, we find no reason to disregard this testimony, especially as it is corroborated in various details by the testimony of Horner, which was accepted by the trial examiner and the Board.

The Board, in reversing the finding of the trial examiner that respondent discharged Fritts for proper cause, accepted his finding that Fritts had made the threats against Horner and Kitts, but excused this conduct on the ground that Fritts had a reputation as a practical joker; that he talked quite a bit; that he was "pretty good about shooting the bull"; and that

1. While Fritts, in a qualified, uncertain manner, denied making the threats, the trial examiner found that he was evasive at times, incoherent in his testimony, and that some of his statements indicated inferentially that he had made some of the remarks testified to. Accordingly, the examiner stated, in his findings, that from his observation of the witnesses, he did not credit Fritts in regard to the statements made to the boys, but relied upon the testimony of Horner and Mallonee.

his statements were not coercive but "mere predictions of a fellow workman" which "merely reflect the usual enthusiasm of rank and file employees in organizational campaigns." The Board further found that Fritts' statement to the two boys in telling them they should join the union, at once, because they would have to join later, clearly "referred to attainment by the Union of a union-shop contract, an entirely legitimate objective."

Contrary, however, to the Board's conclusions, the attainment by the union of a union-shop contract was not, in Tennessee, a legitimate objective, since under the laws of Tennessee, a union-shop contract is illegal; and this fact had been mentioned by various of the witnesses in their testimony on the hearing.

■ Was the discharge of Fritts, then, discriminatory and a violation of the Act? Many interesting questions are submitted by counsel in their briefs as to whether Fritts, himself, as an agent of a labor organization, was guilty of an unfair labor practice in restraining and coercing Horner and Kitts in the exercise of their rights under the Act, in violation of 29 U. S.C.A. § 158(b)(1)(A). It is unnecessary, however, to determine such somewhat novel questions as to whether Fritts was acting as an agent of the union, and whether his conduct came within the inhibition of this section of the statute, as our decision herein rests upon already well-established principles heretofore laid down by the courts. It is the rule that the employer may hire and discharge at will, so long as the action is not based upon opposition to union activities. National Labor Relations Board v. West Ohio Gas Co., 6 Cir., 172 F.2d 685, 688; see also National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893. As far as the Act goes, the employer may discharge for any reason except union membership, activity, or relationship. Harp v. National Labor Relations Board, 10 Cir., 138 F.2d 546; and although union activity is a fact to be considered in connection with other facts upon the issue of discrimination in regard to hire and tenure of employment, an em-

ployee may be discharged for any reason not prohibited by the Act. Stonewall Cotton Mills, Inc. v. National Labor Relations Board, 5 Cir., 129 F.2d 629. If a discharge is not arbitrarily made with a purpose, or as an excuse, to avoid the statute, it is not unlawful. Albrecht et al. v. National Labor Relations Board, 7 Cir., 181 F.2d 652. The controlling fact is what was the true reason back of the discharge. Victor Mfg. & Gasket Co. v. National Labor Relations Board, 7 Cir., 174 F.2d 867. In this case, if Fritts was discharged because of his threats to Horner and Kitts as to their joining the union and because he carried on such conduct during working hours, bothering them and impairing their efficiency, the action of respondent would be justified, although it is not necessary for an employer to justify the discharge of an employee so long as it is not for union activity. National Labor Relations Board v. Union Mfg. Co., 5 Cir., 124 F.2d 332; but if he were discharged because of his union activity, respondent would be guilty of an unfair labor practice.

Fritts himself testified that he understood he was discharged by shop superintendent Davis for threatening the boys; that although Davis asked him whether he was a member of the union, he never made any threats that he would be discharged or discriminated against for union activity, or made any promises as to his employment status if he avoided going to the union meetings. Fritts also stated that Mallonee never discussed the union with him; that the union was not discussed at respondent's place of business; that nobody talked about it there. A week or so before Fritts was discharged, he had the accident, heretofore mentioned, driving a bus into another and damaging it. The next day, when he showed the damage to Davis, Davis told him he knew he couldn't help it, but to be careful the next time; and did not in any way criticize him for the mischance.

The Board, in finding that respondent not only was guilty of discrimination in discharging Fritts, but also was guilty of interference with its employees in their union activities, based its conclusions on a

number of conversations, statements, and inquiries on the part of shop superintendent Davis, assistant shop superintendent Mitchell, and foreman Mallonee, which, it held, resulted in unfair labor practices under the Act; and we shall discuss these statements and inquiries and the circumstances surrounding them, not only as bearing upon the discharge of Fritts, but also upon the charge of company interference in union activities. At the time of the hearing, Davis was confined to a state hospital suffering from mental illness and, therefore, could not testify; and this fact was known to all of the witnesses at the hearing.

On one of the occasions when the above mentioned inquiries were made, the union organizer, Terry, and two employees of the company, Butler and Baker, together with Mrs. Baker, came to Davis' home to ask for the reinstatement of Arwood, an employee who had been discharged, and whose discharge has since been approved by the Board. According to the evidence, everyone present seemed to be good friends, and a pleasant, friendly relationship prevailed throughout the discussion. Davis asked whether the discharged employee was a member of the union, and seemed surprised to learn that he was. He also made some other inquiries as to who was in the union. Baker, who took part in the conversations, was a close personal friend of Davis from the time he had first started working for the company nearly five years before. He stated that he had often visited in Davis' home, and Davis, in turn, had visited in his home, and at all times, he said, he felt at perfect liberty to go out to Davis' house at any time, and was always welcome as a guest. As a witness called by the Board, Baker testified that in his opinion, Davis had never discriminated among the employees; that they often had talks together about the union, in which Davis purported merely to be expressing his personal opinion; that Baker had been a member of a union for several years, and that this fact was generally known to the supervisory employees. Baker further said that neither Davis nor any other supervisory employee

had ever implied that they would take action to penalize or discriminate against anyone who joined the union, or reward anyone for not joining. This seems especially significant in view of the fact that Baker was one of the employees who, before the hearing, had been discharged by Davis, and whose discharge was approved by the Board. Arwood, the discharged employee concerning whom the group came to see Davis in order to have him reinstated, later testified as a Board witness, and, although he too had been discharged by Davis, stated that he always thought a lot of Davis; that he was a reliable man, fair with the employees, and that Arwood never found him a person to discriminate among any of the employees.

On another occasion, it was testified by Charles Clabough, an employee of the company, and a Board witness, that Davis had asked him how he was going to vote; whether he belonged to the union; and, further, asked him to go around to the other employees and get them to vote against the union. Clabough stated that he had been told before testifying that Davis was confined in a mental hospital and could not contradict anything he said. The Board, in any event, held that such a request made to Clabough by Davis was not an unfair labor practice because it contained no threat of reprisal or promise of benefit; but it held that the inquiry of Davis as to Clabough's membership in the union was violative of the Act. However, in this regard, Clabough testified that although he had previously damaged a bus, he had not been penalized in any way by Davis, even though the latter knew he was a member of the union at that time; that neither Davis nor anyone else ever made any promises of any benefits if he did not join the union or vote for it, or made any statements which in any wise would lead him to believe that he had been discriminated against or that his job would become insecure if he voted for the union or belonged to the union. He further stated that he never knew of Davis being unfair to his employees or not treating them alike, whether members of the union or not, and that Davis always treated him as fairly

and squarely since he had been a member of the union as before that time; that he never played any favorites as far as union membership was concerned.

No employees or witnesses ever considered that Davis had any ill feeling or hostile attitude toward them because of their union activity, or that their jobs would be less secure because of union membership; and it is a remarkable circumstance that, in such a contested proceeding, with Davis unable to be a witness, every employee, even those who were discharged by Davis, bears witness to his fairness to all, and to the fact that he never played favorites, never discriminated among them, and always treated them alike, union or non-union. There seems no doubt, however, that he asked certain employees about their membership in the union and whether others were members. But nothing that he did at any time indicated the threat or possibility of reprisal for joining, or promise of benefit for abstaining from, any union activity. Most of his questions on the subject arose naturally from his conversation with those who were his personal friends among the employees. During the organizational campaign, his concern seemed to arise from the fact that he thought some of the employees might have certain personal grievances against him that he could not understand. To one employee, he stated: "I wanted to talk to you about this voting and this union. * * * I don't see what the union has got against me. * * * The union has got me in trouble with Mr. Kraemer (the President). He thinks I am not doing my job or the union would never have started." But nothing that he did, or said, or was claimed to have said, implied any coercion, threat, or promise.

With reference to its conclusions that respondent interfered with its employees' right to self-organization, the Board attached importance not only to what Davis said, but also to the statements and alleged statements of assistant superintendent Mitchell and foreman Mallonee. Mitchell, who had worked for the company for twenty years, had come up through the ranks. With respect to his statements, Baker testified that while he was working one day, Mitchell came over to him and asked how they were getting along with the union; that Baker told him "it would go in for 90 per cent"; that Mitchell then said he would hate to see it go through, and that if it did, "Al (the President) would sell out to big Greyhound and it would ruin them"; that, on another occasion, he had a talk with Mitchell off the company's premises, in the course of which Mitchell said, "the unions weren't straight. * * * He said he sure didn't want to see big Greyhound get Tennessee Coach Company." According to Charles Garrett, another employee, and a Board witness, Mitchell asked him if he belonged to the union, and upon his reply that he did, responded: "Well, this is a free country," but further remarked that "we didn't need the union and if the union went through that Mr. Kraemer would sell out to Southeastern Greyhound, he would load his tools up and leave." Mitchell denied saying anything about the Greyhound Company to either of the men. With regard, however, to the two foregoing conversations, Baker, who, as remarked, was a discharged employee, nevertheless testified that Mitchell at no time had made any statements or any promises of benefits to him or to the other members of the union or to the other employees if they didn't vote for the union; and that he made no threats of any kind which might lead them to believe that they would be fired or discriminated against or in any way penalized for joining the union. He further stated that his foreman at the motor shop never had anything to say about the union. Garrett's testimony likewise clearly indicated that nothing that Mitchell said to him carried any threat of reprisal or promise, or ever implied any suggestion of coercion or restraint; and that at no time was union activity or membership the cause of any belief on the part of the employees that any discrimination might result because of it.[2]

2. Garrett's additional testimony is typical of that of the employees of respondent company, whether they were called as witnesses by the Board or by the respondent. He testified:

Assistant superintendent Mitchell testified that at the time of the organizational campaign, he had instructions from the company: " 'Hands Off,' remain in a neutral position"; and that this had always been the policy of the company. Mallonee also testified that the president had ordered him to remain neutral in the organizational campaign.

However, Mallonee stated that he had discussed the union with a number of employees; that often they came to him asking his advice in the matter; that he also asked them how they felt about it; that, in talking it over with them, he was acting on his own and felt he had a right to his own opinions and to speak his own mind; that he was talking to them as man to man; that he had worked with all of the employees there as a fellow employee before he became foreman; that he advised and counseled with them on many different

"Q. Do you know of any employees of Tennessee Coach Company that was for the union that had been discriminated against by Tennessee Coach Company as a result of the union membership? A. I do not.

"Q. During the entire election campaign by the union, the organization of the union, do you know of any promises of any benefits the company made to its employees if they didn't join the union or vote for the union? A. No.

"Q. Do you know of any statements or threats made by the company to the employees as to what might occur to the particular employee if he voted for the union? A. No.
*　*　*　*　*　*

"Q. Do you know or did you hear of any supervisory employees going around telling the employees how they had to vote in this election? A. I did not.

"Q. They did not undertake to tell you or anyone that you heard of how to vote? A. No.
*　*　*　*　*　*

"Q. This conversation that you related of having with Mr. Mitchell, did he at that time make any promise to you of any betterment or hope of increased wage or anything if you didn't vote for the union? A. No.

"Q. Did he tell you that it was your privilege to belong or not to belong to the union? A. That was my—that this was a free country, that I could do whatever I wanted to.

"Q. That you could do whatever you wanted to in that regard. When he said that, he didn't make any statement which led you to believe that your job security or your right to continue to work at Tennessee Coach Company would in any wise be interfered with? A. No."

Other remarks of Mitchell said to have been made to employees Rutledge and Payne indicate no suggestion of coercion, or implication that the employees would be considered by Mitchell or by the company in any unfavorable light because of

their union activity. Rutledge, a Board witness, testified with regard to a conversation with Mitchell:

"Q. What did he say to you? A. He asked me how I felt about the union, and I told him I was for anything that was for the good of the men. He said he was, too; he didn't see how that could help us any.
*　*　*　*　*　*

"Q. At the time you were hired by the company, did they inquire of you whether you belonged to the union or didn't belong to a union? A. No, sir.

"Q. When Mr. Mitchell was talking to you about the union, the conversation you related awhile ago, did he make any promises of benefits to you if you didn't vote for the union? A. No, sir.

"Q. Did he make any statements which you construed as a threat as to what might happen to you and security of your job if you did vote for the union? A. No, sir. I told him that I signed up. He told me 'that is your privilege; that is the privilege of every man here.'
*　*　*　*　*　*

"Q. You are now employed by Tennessee Coach Company? A. Yes, sir.

"Q. You have been employed ever since then with Tennessee Coach Company? A. Yes, sir.

"Q. You told him that you were a member, had signed up? A. I told him I had signed up; yes, sir.

"Q. Do you think that you have in any way been discriminated against in your job or your work at Tennessee Coach Company? A. No, sir.

"Q. Since your conversation with him? A. No, sir.

"Q. Since you signed up with the union? A. No, sir.

"Q. Anything ever been said to you by a supervisory employee that might lead you to believe that your job was insecure because of union membership? A. No, sir."

Payne, a Board witness, testified to the same effect.

matters; that he felt every man who worked there was his personal friend; he associated with them off hours and felt close to them; he and the men he supervised visited back and forth in each other's homes; and, at respondent's place of business there was no line of demarcation between being a supervisory employee and just a working employee—"not from the janitor to the president of the company. They are all equal"; and no evidence was introduced to contradict the general tenor of this conclusion.

The Board concluded that the statements and inquiries of the supervisory employees, Davis, Mitchell, and Mallonee, represented the expression of the views of the company; and that respondent thereby restrained and coerced its employees in respect to their rights of self-organization, in violation of the Act, and, accordingly, was guilty of an unfair labor practice.

■ Whether acts of supervisory employees constitute restraints upon union activity on the part of a company must be viewed, to a large extent, against the background of the company's attitude, policy, and practice in the past with regard to such matters. Where an employer has no history of labor trouble or union hostility, and repeatedly advised its employees, in unmistakable terms, that they might, without fear of reprisal, exercise freedom of choice in their actions and opinions on labor matters, expressions of union hostility by some of the supervisory employees are to be regarded as the individual views of such employees, rather than as the views of the employer. National Labor Relations Board v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556. Isolated or casual expressions of individual views made by supervisory employees, not authorized by the employer and not of such a character or made under circumstances reasonably calculated to generate the conclusion that they are the expression of his policy, fail to constitute interference with the employees in the exercise of their right of self-organization, National Labor Relations Board v. Fairmont Creamery Co., 10 Cir., 144 F.2d 128; and in a labor controversy, where a general manager of a corporation told the employees that they would get nothing from joining a union, and that it was organized by racketeers, together with other similar statements, all of which were made without threatened, coercive, or punitive action, it was held that such statements were within the right of free speech. Jacksonville Paper Co. v. National Labor Relations Board, 5 Cir., 137 F.2d 148. In National Labor Relations Board v. Hinde & Dauch Paper Co., 4 Cir., 171 F.2d 240, where it appeared that a foreman had inquired of an employee how she intended to vote, and stated to another employee that if the plant was organized, the owner would close it down, the court denied enforcement of the Board's order based on such statement and inquiry, on the ground that there was nothing to show that they were made with the approval of the management or that they constituted part of a program of intimidation.

The National Labor Relations Act, originally enacted in 1935, 29 U.S.C.A. § 151 et seq., was amended by the Labor-Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., and it was therein provided: "§ 158(c). The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute nor be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

■ In the absence of circumstances evidencing coercion, isolated statements by supervisory employees do not constitute violation of the Act. National Labor Relations Board v. West Ohio Gas Co., 6 Cir., 172 F.2d 685.

With regard to the background of the company, all of the evidence in the case, including that of the Board witnesses, indicates not only that there had never been any previous record of labor trouble or hostility on the part of respondent, but, on the other hand, shows that there was a fair and friendly attitude at all times toward organized labor. The president of the Tennessee Coach Company, Al Kraemer, was a machinist before he was a bus

operator, and belonged to the machinists' union. He is also an honorary member of the musicians' union. The Tennessee Coach Company owns the stock of the Knoxville Transit Lines, which operates the transportation system of the City of Knoxville. Mr. Kraemer is also president of the Transit Lines, where they have had a local of the union involved in this case during the past ten years. He testified that his instructions to all of his departments were to be fair to everybody on all religious, political, and union matters; that during the so-called organizational campaign by the union in this case, he issued instructions to all supervisory employees to be absolutely neutral and not to make any statements one way or another, but to let the men make their own choice. He further stated that it was never a policy of the respondent company not to hire union employees but that, on the other hand, they had quite a few union men. With regard to employee Baker, one of the men who was discharged, President Kraemer stated that he had known Baker was a member of the union several years before and that, at one time, they had, in a friendly way, shown each other their union credentials. Mr. Burke, the vice president, testified also that the company had never discouraged the organization of union labor; that they always undertook to have the supervisory employees keep their hands off in such matters; that, with respect to the election in question, he had told them to be careful and not to get involved in it, and that if the union won, the company would abide, and if not, it would go along as it had done; and that he had never known of shop superintendent Davis dealing unfairly with any of the company employees. The general traffic manager and the chief dispatcher of the company likewise testified to the same effect, and that they had instructions to be neutral and maintain a hands off policy during the organizational campaign.

If Mitchell's statement that the president of the company would sell out to the Greyhound Company could be considered a threat, it is to be said that Mitchell did not state that President Kraemer had said he would sell out. It is not claimed that Kraemer ever made such a statement or authorized it, directly or indirectly. No employee intimated that he was influenced in his voting on the union proposal by such alleged statement on the part of Mitchell. In fact, it appears they voted for the union without paying any attention to Mitchell. See National Labor Relations Board v. Mylan-Sparta Co., 6 Cir., 166 F.2d 485. Where an individual not associated with an employer, but acting in his interest and therefore subject to the Act, addressed a meeting of the employees, and referring to the fact that other companies had ceased doing business in the city in the past because of union activities, expressed his opinion that union organization then under consideration in the plant would result in its closing, it was held that the prophecy so voiced, did not in itself constitute a threat or coercion, the court remarking that the individual in question was not a part of the company management, and had no authority or power to change prophecies into realities.

■ Before inquiries as to union membership and statements by employers or supervisory employees can be held to be unfair labor practices, they must be shown to have some relation to the coercion or restraint of the employees in their right of self-organization. None of the inquiries and statements made by the supervisory employees in this case were of such a character as to form any reasonable basis for the conclusion that they proceeded from an anti-union policy of the company and interfered with such rights of employees. In fact, while some of the supervisory employees indicated they were opposed to making the union the bargaining agent, all of the statements complained of purported to be merely the individual opinions of the persons making them. See Humble Oil & Refining Co. v. National Labor Relations Board, 5 Cir., 113 F.2d 85. The undisputed testimony of all witnesses, both for the Board and for the respondent, shows that neither the supervisory employees nor the respondent expressed any views that contained threats of reprisal or force or promise of benefits which would

have tended to restrain, coerce, or intimidate the employees in the exercise of their right to organize and bargain collectively; and the evidence is clear and undisputed that none of the employees received the impression that anything said by the supervisory employees constituted any threat to union activity or that his job would be less secure because of union membership. The company's background was one of harmonious relations with union members and with unions. In regard to the so-called organizational campaign in this case, W. C. Terry, the organizer for the union, testified that during his negotiations with the company leading up to the consent election, working out and agreeing on the eligibility list, as well as agreeing on the watchers at the various polls, the relationship between him and respondent company was always on a pleasant and agreeable basis. Before the election, President Kraemer sent a letter to his employees commenting upon, and complaining of what he termed a derogatory letter concerning him that was sent out by a business agent for a bus employees' union, which was not the union involved in the election. In his letter, he stated that the employees had always known him; that he and the other officers had always handled their problems for the past twenty years, and that the question before them was whether they wanted some outsider to come between them and handle their affairs in the future. He obviously felt the relations of the company and the employees would be more satisfactory without the interposition of the union in question; but there was no threat or promise that could even remotely be considered coercive in the letter. He emphasized that the election would be by secret ballot like the city and county elections; that a majority vote would decide; that no one could know how they voted; that they could record their votes as to how they felt regardless of whether or not they belonged to a union; that their preference in the past would not govern their vote in the election; and that whatever the election decided, the company would so continue, because he considered every employee as his personal friend "for the fu-

ture as in the long and pleasant past." It is clear that the president and the officials of the company consistently acted to avoid coercing and restraining the employees with regard to their rights of self-organization. It is impossible to conclude from an examination of the evidence in this case that respondent interfered with, coerced, or restrained its employees in the exercise of their right of self-organization, or that, in its relations with its employees, it was guilty of an expression of any views containing a threat of reprisal or force or promise of benefit.

On a consideration of the record as a whole, we are of the opinion that the conclusion of the Board that respondent was guilty of discrimination in violation of the Act in discharging Fritts, and that it interfered with its employees in the exercise of their rights of self-organization, as well as the order entered thereon, were not sustained by substantial evidence. National Labor Relations Board v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453.

In accordance with the foregoing, a judgment will be entered denying enforcement of the order of the Board.