NATIONAL LABOR RELATIONS
BOARD, Petitioners,

v.

ADKINS TRANSFER COMPANY,
Inc., Respondent.

No. 12371.

United States Court of Appeals
Sixth Circuit.

Oct. 5, 1955.

Owsley Vose, Washington, D. C. (David P. Findling, Marcel Mallet-Prevost, Elizabeth W. Weston, Alice Andrews, Washington, D. C., on the brief), for petitioner.

Judson Harwood, Nashville, Tenn., for respondent.

Before McALLISTER, MILLER, and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed a petition for enforcement of its order issued against respondent, Adkins Transfer Company, finding it guilty of violation of Section 8(a) (3) and (1) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., and directing it to offer reinstatement to two former employees in any available jobs, at Nashville, Tennessee, substantially equivalent to those in which they had been employed before their discharge; to place them on a preferential hiring list in the event such employment was not available; to give them priority in filling any position for which they were qualified; and to save them whole by means of appropriate back pay. Respondent company submits that it was guilty of no violation of the Act; that the discharge of the two employees resulted because respondent determined that it could not profitably carry on the maintenance and servicing department in which they were engaged; and that, in lieu of paying the high wages required by the union, of which the employees were members, respondent terminated its maintenance and service work at Nashville, and arranged to have it done by outside business concerns.

Respondent is a small truck line operator, carrying on its business between Chicago and Nashville, with the latter as the extreme southern point served. Its Nashville terminal utilized approximately eight trucks per day in transporting shipments to other cities, and four pick-up trucks for local work in Nashville. There is no evidence of any anti-union attitude on the part of the respondent, but, on the contrary, it has been on good terms with the local Teamsters Union, which is the charging party in the case. In fact, all of its road drivers are members of the Teamsters Union, and all of its local pick-up men and dock men are also members of the union. In addition, all extra employees engaged by respondent are procured by calling the local Teamsters union hall, whereupon the union sends such extra employees to respondent's place of business. This practice is followed in spite of the fact that there is in effect in the State of Tennessee the type of statute known as an open shop statute.

In November, 1953, respondent employed a mechanic and a helper whose duties were exclusively the maintenance and servicing of respondent's trucks. These are the employees involved in this case. In the same month that their employment commenced, the two employees joined the local Teamsters Union. Thereafter, the union demanded that respondent bargain with it for the purpose of entering into two contracts—one, a mechanic's contract for one of the employees, and the other, a service contract, for the other employee. At that time, one of the employees was paid at the rate of $1.25 per hour, and the other, 75 cents per hour. The union representative met with respondent's president and showed him copies of the union's uniform contracts covering mechanics and service men which were currently in effect between the union and other Nashville motor carriers. The various job classifications and the applicable wage rates specified in the contracts were discussed. As the union representative pointed out, under the contracts which he proposed that respondent adopt, one of the employees would receive $1.75 an hour, an increase of 50 cents over his current rate, and the other would receive between $1.-25 and $1.40 per hour, an increase of be-

**326**

tween 50 and 65 cents over his current rate. There was no discussion as to whether a compromise could be reached on wage scales.

The first meeting between the union representative and respondent's president took place November 16. A second meeting occurred November 20. On the next day, the foreman came into the shop where the two employees were working, and stated that he had bad news for them—that the president was going to close the shop because he was not going to pay the union scale. At the direction of respondent's president, the foreman thereafter discharged the two employees. Respondent's president testified with regard to this incident, without contradiction or challenge, that it was "purely and simply a question of costs." Respondent's mechanical work since the discharge of the employees has been done on a job-by-job basis by local truck and automobile dealers, and the servicing has been done partly by its own operating employees and partly by independent business concerns. Respondent's president testified that he found this method of having the mechanical work done had resulted in even lower labor costs than those entailed by its former method of operation, under which respondent had paid $2.00 an hour for the combined services of the two employees. Respondent never replaced the two men, and its president testified on the hearing that it did not intend to.

A hearing was held before the trial examiner who, after listening to the witnesses, filed findings of fact, conclusions of law, and a recommendation. He set forth in his findings that respondent's president testified, credibly, that, based upon his experience in dealing with the union, he believed that if respondent had continued its maintenance department at Nashville without raising the wages of the two employees to meet the union scale, a strike would have ensued which would have effectively closed down respondent's entire business operations. The examiner stated that the accuracy of such opinion was substantiated by the statement of the union representative who testified, on the hearing, that he knew of no instance when the union permitted a contracting employer to pay union members different wage rates than were provided in the union's uniform industry agreement for the particular employee classification. He found that respondent's president, rather than capitulating to the union demands and increasing the wages of the two employees, which he considered economically disadvantageous to respondent, had discontinued the maintenance department and discharged the two maintenance employees. He further found that respondent's president testified that the fact that the two employees joined the union did not motivate their discharge. The trial examiner concluded his findings with the following statement: "This is not a case where an employer who is generally hostile towards unions and opposes employee organization seeks to defeat his employees' efforts to engage in collective bargaining by discontinuing a department in which a majority of the employees have selected a collective bargaining representative. * * * In this regard, it is significant that the complaint does not charge that the Respondent has refused to bargain in good faith with the Union. Here, the Respondent had only two practical choices, either to pay its maintenance employees the wage rates demanded by the Union, or discontinue its maintenance department. No area for bargaining with the Union existed." The examiner then went on to point out that the union representative had testified that, if respondent had kept the maintenance department open but had declined to sign the union contract, the union procedure would have been to call a strike, and that a strike in which the Teamsters Union controlled the over-the-road men and the dock men—as in this case—usually resulted in a 100% shutdown of the company. The examiner, therefore, found that respondent had committed no unfair labor practice by choosing to discontinue its maintenance department and to discharge the two

maintenance employees, especially in the absence of evidence of other unfair labor practices or animus toward the union; and that, accordingly, respondent did not discharge the employees to encourage or discourage membership in the labor organization, in violation of Section 8(a) (1) and (3) of the Act. He concluded by recommending that the complaint be dismissed.

The Board, however, rejected the recommendations of the trial examiner and his conclusions as to the alleged unfair labor practices. It held that the discharges established a prima facie case that the dismissal was violative of Section 8(a) (3) and (1) of the Act for the reason that the employees would not have been so summarily dismissed if they had not joined the union, and had not sought, through the union, to exercise the rights incident to union membership. The Board further said that respondent had not sustained its burden of dispelling the inferences fairly to be drawn, and that its claim that the dismissals represented an attempt to resolve a difficult economic position was supported "by nothing more than its subjective anticipation of what the Union might do, rather than upon what the Union actually did do in its representation of these employees." It, therefore, held that the dismissal was violative of the Act and outlined the remedies already mentioned.

As to whether respondent's claim was supported by nothing more than its "subjective anticipation" of what the union might do, it is illuminating to refer to the testimony of the union representative. He was asked, first, about the over-the-road contracts and stated that the union had those contracts with 99% of the concerns in Nashville. He was then asked:

"Q. And are those contracts in all respects identical in all companies? A. Yes, sir.

"Q. And does one company have one wage rate that might be different from another company? A. No, sir.

"Q. Has that ever happened that you know of? A. Not to my knowledge.

"Q. Is the same thing true with reference to the pick-up and delivery men? A. Yes, sir.

"Q. And with the mechanics contract? A. Yes, sir.

"Q. And the service men's contract? A. Yes, sir."

■ The above, taken together with the union representative's testimony that the union procedure would have been to call a strike if respondent had kept his maintenance and service departments open and refused to sign a contract, and that such a strike usually resulted in a 100% shut-down of the company, is clear and ample proof that respondent, as found by the trial examiner, had only two practical choices—either to pay the wage rates demanded by the union, or to discontinue its department.

■ We are of the view that the trial examiner was right and the Board was wrong in its decision and order. Only such discrimination as encourages or discourages membership in a labor organization is proscribed by the Act. Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. In order to establish an 8(a) (3) violation, there must be evidence that the employer's act encouraged or discouraged union membership. The section requires that the discrimination in regard to tenure of employment have both the purpose and effect of discouraging union membership, and to make out a case, it must appear that the employer has, by discrimination, encouraged or discouraged membership in a labor organization. There was no such discrimination in the instant case. A company may suspend its operations or change its business methods so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the Act. National Labor Relations Board v. Houston

Chronicle Pub. Co., 5 Cir., 211 F.2d 848. An employer may discharge or refuse to reemploy one of his employees for any reason, just or unjust, except discrimination because of union activities and relationships, and the controlling and ultimate fact which determines an issue of the kind here presented is, what was the true reason back of the discharge. National Labor Relations Board v. Kohen-Ligon-Folz, Inc., 5 Cir., 128 F. 2d 502. We have said that the employer may hire and discharge at will, so long as the action is not based upon opposition to union activities. National Labor Relations Board v. West Ohio Gas Co., 6 Cir., 172 F.2d 685. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893. As far as the Act goes, the employer may discharge for any reason except union membership, activity, or relationship. Harp v. National Labor Relations Board, 10 Cir., 138 F.2d 546. If a discharge is not arbitrarily made with a purpose, or as an excuse, to avoid the statute, it is not unlawful. Albrecht v. National Labor Relations Board, 7 Cir., 181 F.2d 652.

█ Evidence that particular jobs had been discontinued and that no replacement employees have been hired tends to show that the discharges were not discriminatory. National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 107 F.2d 574. The crucial and controlling fact is what was the true reason back of the discharge. National Labor Relations Board v. Tennessee Coach Co., 6 Cir., 191 F.2d 546. See also Victor Mfg. & Gasket Co. v. National Labor Relations Board, 7 Cir., 174 F.2d 867. It seems impossible to challenge the conclusion that the true reason back of the discharge of these two employees was to avoid paying higher costs for the work performed than was required by having it done by outside concerns.

There is little direct authority on the exact proposition before us in federal adjudications on the exact point, but a guide may be found in a certain leading case from New York, which has a statute comparable to the Act. In Paul v. Mencher, 169 Misc. 657, 7 N.Y.S.2d 821, affirmed 254 App.Div. 851, 6 N.Y.S. 2d 379, where an employer elected to discontinue a branch office business but continued to retain other departments of the business, a union which commenced picketing for the purpose of compelling him to reopen the discontinued business was enjoined in a decision in which the court stated, in its opinion: "When the plaintiff elected to discontinue his factory no one was privileged to complain *even though it was done deliberately to avoid a labor dispute.* It may be unfortunate and regrettable that because of such decision willing workers are rendered idle and unhappy. When the question of the legality of an act is alone involved, the law is indifferent to the result thereof. If plaintiff had the right to close down his factory the fact that a number of people are foreclosed of employment cannot govern or limit the exercise of that right by him." (Emphasis supplied.)

It is true that what might be termed the secondary reason for the discharge of the two employees was because they were members of the union, but the fact that they were members of the union was only incidental, and was not the real reason behind their discharge. The real reason was because the union wage scales were too high for respondent to operate profitably the department in question; and, since the employees were members of the union, respondent would be obliged to pay those rates, or close the department, or suffer a strike. It is plain that there was no interference or restraint or coercion of the employees in their rights to self-organization or collective bargaining, and there was no discrimination to encourage or discourage membership in a labor organization. Consequently, there was no violation of Section 8(a) (3) and (1) of the Act.

Respondent had no feeling against the labor union. All of his employees were already members of the union, and his relations with them and the union were friendly and cooperative. The only con-

sideration that actuated respondent in dismissing the employees was, not that they were members of the union, but that the union wage scales were too high for this particular employment and that such services could be more cheaply performed by outside business concerns. All of these facts are indubitable from the evidence before us. It is our view that the trial examiner's finding and recommended disposition are both factually and legally correct, and that the Board's findings of fact to the contrary are not supported by substantial evidence on the record as a whole.

In accordance with the foregoing, a decree will be entered denying enforcement of the order of the Board.