**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**E. S. KINGSFORD, Doing Business as Kingsford Motor Car Company, Respondent.**

**No. 14977.**

United States Court of Appeals
Sixth Circuit.

Feb. 28, 1963.

William J. Avrutis, National Labor Relations Bd., Washington, D. C. (Stuart

Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Bd., Washington, D. C., on the brief), for petitioner.

O. S. Hoebreckx, Robertson, Hoebreckx & Davis, Milwaukee, Wis., for respondent.

Before CECIL, Chief Judge, MILLER, Circuit Judge, and BOYD, District Judge.

BOYD, District Judge.

The National Labor Relations Board here seeks enforcement of its Order against the respondent, following its adoption of the Trial Examiner's findings that respondent had committed certain unfair labor practices involving violations of Section 8(a) (1) and (3), National Labor Relations Act; Title 29 U.S. C. § 158(a) (1) and (3).[1] The Board found that respondent's discontinuance of a part of his business operations, his automobile body and paint shop, and the discharge of the employees engaged therein constituted discrimination proscribed by the Act. The Board further found that three employees in another department had been discriminatorily laid off or discharged because of union affiliations, the Board concluding that all of the discharges and layoffs herein were made with the purpose of destroying the union's majority status in connection with a pending representation election. The Board also found certain statements made on two occasions by a superviser to an employee to be coercive in violation of Section 8(a) (1) and the statements made in the course of an election eve

[1]. "§ 158. * * *

"(a) It shall be unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

* * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *

"§ 157. * * *

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

speech by respondent were also coercive in nature and in violation of this section. The Board's order directs that the respondent cease and desist from such unfair labor practices as were found. In its order the Board further directed, by way of affirmative action, that the respondent offer reinstatement to and make whole the employees discharged in connection with the closing of that part of respondent's business aforesaid, even if it meant the re-opening of this part of the respondent's operation; that the respondent offer reinstatement to and make whole the remaining three discharged employees; and that the usual notices be posted. The respondent contends that there is no substantial evidence on viewing the record as a whole to support the Board's findings. It is further contended by the respondent that the portion of the Board's order requiring re-opening of the body and paint shop is invalid.

The respondent, E. S. Kingsford, is the sole proprietor of an automobile sales and service establishment which is a franchised Ford automobile dealership. The operation is composed of two facilities; the main service garage and former body and paint shop, located at Kingsford, Michigan, and the main office and showroom, located at nearby Iron Mountain, Michigan. That the respondent is engaged in interstate commerce is undisputed.

Kingsford had fifteen non-supervisory employees as of December 1960, eleven of whom on December 30, 1960, met with a representative of the union involved herein.[2] These eleven employees each signed an application for membership in the union and a certification of union membership authorizing the union to bargain in the employee's behalf. On January 6, 1961, the respondent received the certifications and notice from the union that it had been designated to negotiate a bargaining agreement in behalf of a majority of respondent's employees. On January 9, respondent no-

tified the union that a Board election would be necessary before he would recognize the union as bargaining agent. The union filed a representation petition with the Board and simultaneously requested of respondent that he agree to a consent election. This the respondent refused and on January 16 a representation hearing was scheduled for January 24 by the Board's Regional Director. A representation election was thereafter scheduled for April 5, 1961.

## I. The Discontinuance of the Automobile Body Shop Operation.

The body and paint shop portion of Kingsford's automobile business was staffed by three employees; Peterson, Tripp and Larson. Each of these employees had joined the union and this was known to the respondent. On January 19, 1961, three days after the setting of the representation hearing, the respondent's Service Manager, Edwin E. Davey, informed the three body shop employees that as of Saturday, January 21, the body shop operation was to be discontinued and their employment terminated. On inquiry by Peterson as to whether their union affiliation was involved in the decision to close the body shop, Davey answered that he did not know, that he, Davey, was an "outcast." The testimony indicated that the closing of the body shop had come as a surprise to the three employees and Davey. Since the discontinuance of the body shop operation, the body and paint work has been contracted out to two independent body shops.

Two reasons were given by respondent for the closing of the shop aforesaid. One reason assigned was that it had failed to contribute its proper share of profits to the business as a whole. The other reason given by respondent was that due to the fact that Davey supervised the entire two-level service operation at Kingsford, the downstairs location of the body shop had rendered its supervision difficult. The Trial Examin-

Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 328, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

er after inspection of respondent's records found that the first reason given by the respondent, the economic factor, did not stand scrutiny; that in view of his evident opposition to the union, and the sequence of events during the period in question, the closing of the body shop was illegally motivated under the Act.

■ ■ The sufficiency of the economic reason given for the discontinuance of this portion of respondent's overall business is the salient factor deserving of our attention in this area of the case. A company may clearly suspend its operations or change its method of doing business, with resulting loss of employment, so long as such change is not motivated by desire to defeat employee rights guaranteed by the Act. Business changes effected for economic reasons are not proscribed by the Act and do not constitute unfair labor practices. N. L. R. B. v. Adkins, 226 F.2d 324 (C.A.6) 1955; N. L. R. B. v. Mahon, 269 F.2d 44 (C.A. 6) 1959; N. L. R. B. v. Lassing, 284 F.2d 781 (C.A.6) 1960; N. L. R. B. v. Houston Chronicle Publishing Company, 211 F.2d 848 (C.A.5) 1954. The scope of review on this question is the same as on any other factual question arising under the Act, so we are limited to a determination of whether there is substantial evidence from the record as a whole to support the Board's findings. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The finding here involved is one of illegal motivation in the closing of respondent's body shop.

The respondent testified and his records indicated that the Kingsford Motor Car Company enterprise as a whole sustained continuing losses in the five calendar year period ending in 1960. Trade journals introduced at the hearing by the respondent indicate that new and used car sales were drastically off in 1960. Respondent testified and the appropriate records show that he, during the period of declining profits, had put additional capital in the business yet the capital worth of the company had declined. Undisputed evidence disclosed that re-spondent had been forced to liquidate insurance policies and borrow from his wife to meet the company's payroll each month. Respondent testified and it is uncontroverted that he had exhausted his bank credit. Further undisputed evidence discloses that in October and November of 1960, prior to the initial employee contact with the union, the respondent had discussed leasing his body shop to one Jack Minella. The evidence discloses and the Examiner found that during the early part of January 1961, there was insufficient work on either customer or company cars to keep the body shop personnel reasonably busy. The Examiner in his Intermediate Report found the following:

"The volume of work in the body shop was very light in the period in January 1961, preceding the closing of the shop. Figures taken from Respondent's payroll record show that after January 10, Peterson and Larson performed very little normal body work either on customer or company cars. Tripp did almost no regular body work after January 6. The men filled in their time doing cleaning and repair work around the shop."

The Trial Examiner attributed the shortage of work to seasonal factors.

The Trial Examiner discredited the business reasons advanced by the respondent relying in the main on the company's financial records which indicate that there had been gross profits from the body shop operation and that such had steadily increased from a $1,023.00 total in 1955 to $5,379.00 in 1960. The respondent's records indicate that the business had sustained a loss of $10,-870.21 in 1960 and a loss as high as $19,107.17 in 1958. The last year showing a profit from respondent's overall operation was 1955. The Examiner through rather dubious allocation of overhead expenses attributed all the losses, to new car sales and made the following observation:

"In light of these figures, and since one who is losing money in

large sums in one phase of his operations does not normally abandon another phase which is substantially curtailing his overall losses, I cannot accept respondent's testimony that he decided to close the body shop primarily because for several years the body shop had failed to make a satisfactory contribution to the whole of his service and sales operations."

The respondent, within a month after the closing of the body shop, laid off two known union members from his parts department and discharged one other known union member, a janitorial and light service employee. From this sequence of events, from the reasoning above as to business motivation, from statements of respondent found expressive of anti-union bias, and from the timing of the closing of the body shop the Examiner found, and the Board adopted his findings, that the closing of the body shop was a part of an over-all effort to defeat the union's majority status in violation of Section 8(a) (3) and (1) of the Act.

As this court has held in the three aforementioned cases, Adkins, Mahon and Lassing, a change in operations motivated by financial or economic reasons is not an unfair labor practice. In a case such as this, the task of determining motivation is truly difficult, when the employer advances economic reasons of any substance as that which brings about the change. Indeed, the problem is intensified by the obviously true proposition that the employer is free to make bad business judgments without contravening the Act, even though there is a resultant loss of employment. It is not the wisdom or business acumen reflected by the change, which is determinative of whether there is a violation. It is the predominant motive behind the change. N. L. R. B. v. Houston Chronicle Publishing Company, supra. Where there is no apparent reason for the change, the employer's claim of economic motivation is obviously suspect and if inferences may be reasonably drawn from the evidence

that the requisite illegal motivation was predominant in effecting the change, the Board's decision must stand.

Here the record clearly discloses that the respondent was in serious financial difficulty in the operation of his business, which would justify any reasonable business man's attempts to reduce overhead expenses and operational costs. Though the Trial Examiner was apparently in agreement that some action of this nature was warranted toward curtailing costs, he differs with the respondent as to what should have been done. Under the circumstances, the Examiner inferred, a reduction would be understandable as to sales force or clerical employees, but not body shop employees. It is interesting to note that although the Examiner found the body shop employees more productive in gross profits per man than the parts and service employees, he did not include the latter employees as being expendable. To have done so would obviously have hampered the General Counsel's case as to discharge of union employees in that department. To suggest that any cutback in personnel or operational change should have been made in that area producing the most losses, automobile sales, is to overlook the reason for this total operation's existence. This was not a body shop and parts facility with incidental automobile dealership connected. It was, as stated, a franchised Ford automobile dealership wherein the focus of its entire activity was sale of new automobiles. Moreover, the uncontradicted evidence discloses that Kingsford, whose motivation controls, did not consider the body shop's production of profits to be the economic buoy the Examiner considered it to be. In October 1960 and again in November the respondent explored the possibilities of leasing the body shop. This was before the initial contact in December between his employees and the union. The Examiner discounted the importance of this evidence by noting that while leasing the body shop was understandable, the outright closing of it was not warranted because the latter course resulted

in complete loss of income from the facility. We find herein a substitution of business judgment by the Examiner for that of the employer. Because this substitution suggested different avenues of approach to the resolution of uncontradicted business difficulties, the employer's explanation of motivation was discredited. It is significant that the discharged body shop employees were never replaced, nor was the body shop operation resumed. Evidence that particular jobs have been discontinued and that no replacement employees have been hired tends to show that the discharges were not discriminatory. N. L. R. B. v. Adkins, supra, 226 F.2d at page 328. In the Adkins, Mahon and Lassing cases this court found that the evidence to support findings of illegal motivation was unsubstantial in the light of the business reasons advanced in those cases by the employers. In none of those cases was there evidence of anti-union sentiment or animosity. On at least three occasions herein the respondent made statements reasonably inferring hostility toward the union. However, animosity toward the union is an insufficient basis for an inference that the employer's motive for change is illegal under the Act where there is convincing evidence that the change was economically motivated. N. L. R. B. v. Rapid Bindery, Inc., 293 F.2d 170, 175 (C.A.2) 1961. Considering the sequence of events herein and the record as a whole, we find a lack of substantial evidence to support the Board's finding that the respondent's predominant motive for closing the body shop herein was illegal under the Act, when viewed in the light of the convincing evidence concerning legal economic motivation.

II. *The Layoffs of Bergagnini and Valerio and the Discharge of Selle.*

At the time of Bergagnini's layoff on January 27, 1961, there were four employees in the parts department. On January 26, Bergagnini questioned a procedure requiring him to copy an outside body shop estimate onto a Kingsford estimate form. Bergagnini commented at the time that Kingsford no longer operated a body shop. He was sharply advised by a supervisor to do as he had been directed. The next day he was laid off without explanation. Two weeks later Valerio was laid off, also without explanation. Both employees were known by respondent to be union members.

The Board found that these layoffs violated Section 8(a) (1) and (3) of the Act. The evidence in support of this finding is that Bergagnini had been hired four months previous and was told at that time by his supervisor that he could look forward to a bright future with the company. The evidence discloses that the gross profits from the parts department at the time of these layoffs were on the same general level as they were when respondent increased the employee complement in the parts department from three to four by hiring Bergagnini. The Examiner thus discredited respondent's testimony that these layoffs had resulted from overstaffing in the parts department. Other evidence indicates that since the discharges of Bergagnini and Valerio the customers and mechanics have had to wait in line for parts, whereas they had not been so obliged before. Following his discharge, Bergagnini inquired of his supervisor as to when he could expect recall to work. The supervisor replied that recall of Bergagnini was not likely until the union matter was settled. Aside from the overstaffing reason given by respondent, he also pointed out that he was facing union demands he felt he could not meet; that he reduced the hours of remaining personnel from forty-four to forty hours; that not only did he lay off Bergagnini and Valerio, but laid off a mechanic for nine days and discharged Selle. Concerning the discharges of Bergagnini and Valerio, the question of substantial evidence is a close one for several reasons. As noted, that the laid off employees were not replaced is an indication that they were not discriminatorily discharged. Moreover, the Examiner relied heavily on his discrediting of respondent's business reasons for closing the body shop in discrediting respondent's reasons for the layoffs in the

832

parts department, as well as the discharge of Selle. However, the evidence considered as a whole is susceptible of the inference that the layoffs of these two parts department employees were motivated by desire to destroy the union's majority status.

Selle, a janitorial employee, had been in respondent's employ for eight years, had been regarded by all as a good worker, and was known by respondent to be a union member. Although respondent had a "last-in, first-out" seniority policy, Selle was discharged, while respondent retained the services of one Morelli, a non-member of the union, who had two years of employment tenure. The evidence supports the finding that they were of generally equal ability as to their duties. We find substantial evidence to support the Board's finding that Selle was discharged because of union affiliation in violation of Section 8(a) (1) and (3) of the Act. Universal Camera Corp. v. N. L. R. B., supra.

III. *The Election Eve Speech and Statements of Supervisor Carl Minella.*

■■ Statements by supervisor Carl Minella to employe Beitel on two occasions closely prior to the representation election to the effect that respondent's business would be closed in the event that the union won the election were found by the Board to be coercive in violation of Section 8(a) (1) of the Act. Statements to the same effect by respondent in his election eve address to the employees were also found to be coercive and violative of this section. The Board's inference as to the coercive effect of these statements is supported by substantial evidence. Even though such statements may be expressive of opinion only, if their reasonable tendency is coercive in effect, they are violative of Section 8(a) 514 (C.A.6) 1946, cert. denied 330 U.S. (1). N. L. R. B. v. Peterson, 157 F.2d 838, 67 S.Ct. 979, 91 L.Ed. 1285; N. L. R. B. v. Ford, 170 F.2d 735 (C.A.6) 1948.

In the election of April 5, 1961, the ballots of Peterson, Larson, Bergagnini, Selle and Valerio, were challenged. The Board, pursuant to its findings that the layoffs and discharges of these employees were in violation of the Act, directed in its Order herein that the ballots of these employees be counted; that by virtue of Section 2(3) of the Act, these persons had retained their status as employees and were entitled to vote. This court's determination with regard to the discharges of body shop employees necessarily modifies the Board's order as to the counting of their ballots since we find substantial evidence lacking to support the Board's findings involving the discharges of the body shop employees.

Enforcement is denied that portion of the Board's order requiring respondent to re-open his body and paint shop operation. Enforcement is also denied the portion of the Board's order requiring respondent to offer reinstatements to and make whole the former employees of that department.

Enforcement of the Board's order as thus modified is granted.