**JERVIS CORPORATION, BOLIVAR DIVISION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17340.

United States Court of Appeals Sixth Circuit.

Dec. 13, 1967.

Clarence Clifton, and W. Kerby Bowling, Memphis, Tenn., for petitioner, Richard A. Brackhaln, Newell N. Fowler, Memphis, Tenn., on brief.

Warren M. Davison, Atty., N. L. R. B., Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Linda Sher, Atty., N. L. R. B., Washington, D. C., on brief.

Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and CECIL, Senior Circuit Judge.

WEICK, Chief Judge.

The Board found that Jervis Corporation, Bolivar Division, hereinafter referred to as Jervis, committed unfair labor practices in violation of Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by threatening and interrogating its employees concerning their union activities during the course of a union election campaign, by creating the impression that their activities were under surveillance, and by promising benefits for abstention from further union activities. Jervis was ordered to cease and desist from such conduct and to post appropriate notices. 159 NLRB No. 8.

██ Jervis is a manufacturer of automobile accessories, and has a new plant in Bolivar, Tennessee, where it commenced operations in July, 1963. The union began organizational activity almost immediately and held its first organizational meeting in April, 1964. The union started to handbill the employees in May, 1964, and on January 15, 1965, it filed a petition for a representation election. The election, held on March 17 and 18, resulted in rejection of the union. Of 742 eligible voters, 128 cast ballots in favor of the union, and 501 voted against it. It was during this election campaign that all of the alleged unfair labor practices occurred.[1]

Interrogation of employees extended over a period of time from December, 1964, through March, 1965, and generally concerned three subjects. The employee was asked how he felt about the union, how his fellow employees felt about the union, and how many authorization cards had been signed. Shortly after one employee had been questioned concerning his union sympathies, and had indicated that he might favor the union, he was warned by the same supervisor not to "talk union on company time". No testimony of an implicated supervisor was offered before the Trial Examiner con-

1. The Board set aside the election and without waiting for a cooling off period, ordered another election over the objection of the company, which asked for a postponement. The union lost again and the Board set aside the second election. The company contends that the Board erred in setting aside the elections, but this is not reviewable in the present proceeding. A.F.L. v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); NLRB v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396 (1940).

cerning any instances allegedly involving interrogation, and the testimony of the employees was uncontradicted. None of these incidents were of much consequence, however.

The Board found that contemporaneously with its interrogation Jervis was engaged in other violations of 8(a), (1), i. e. threatening the employees with certain consequences if the union won the election. These threats allegedly had been made by supervisors, as well as by a higher company official. Without enumerating the details of the alleged threats, their substance may be summarized as follows: That Jervis would not bargain with the union, even if it won the election; that Jervis had moved its plant from Memphis, Tennessee, because the union had gained entrance there; that Jervis would leave Bolivar if the employees selected the union to represent them; that some of the threats were accompanied by a statement that Jervis owned land and a building in Mississippi, and that the residents of the county there would be willing to pay the company's moving expenses if it should decide to leave Bolivar.

Not all of the alleged threats involved every element mentioned above, but they were typified by the remarks of Supervisor Charlie Jackson as he addressed a group of employees, of which William Cooper was a member. Cooper testified at the hearing that Supervisor Jackson said:

"You boys better watch it. You know what happened in Memphis. * * * You know they moved from Memphis, you know, on account of the union."

In addition, the Board found that the following portions of a recorded speech by Jervis' president which was distributed to its employees and was later played over its public address system and over a local radio station, constituted a threat to employees of loss of jobs if the union won the election. In the pertinent portion of the speech the president said:

"We knew that we had to shut the Memphis plant and we knew that we were free to do so.—The result was that we did shut the plant as we knew we must and as we knew we could and the people that the union presumably represented, lost the termination pay which the company had volunteered (but which the union rejected). In our plant in Grandville, Michigan, this same union has been with us for many years. It is no coincidence, as I see it, that employment in that plant has dropped from a peak of 1200 people to approximately 300 people while the UAW has been representing our employees."

The Board found that although the quoted passage was capable of an interpretation compatible with the Act, it was delivered at a time when there had been prior threats and rumors of plant closing, and within this frame of reference the quoted passage conveyed a meaning to the employee that if he chose to have the union represent him he was faced with plant closure, or at least fewer jobs.

The Board found the company guilty of creating the impression of surveillance. The conduct which gave rise to this alleged unfair labor practice stemmed from a single, isolated conversation between a company supervisor and an employee, out of the hearing of other company personnel.

The Board further found that certain conduct on the part of the company constituted unlawful promises of benefits made with the purpose of dissuading employees from selecting the union as their bargaining agent. Employee Norman Littlejohn was one of the company's most active union adherents. Some time in the middle of January, 1965, Supervisor Derryberry allegedly promised Littlejohn that if he would leave the union alone, within a year he would be a foreman. In March, 1965, shortly before the election, as Littlejohn stood at the plant entrance passing out handbills, he was ap-

proached by Supervisor Sledge. Little-john testified:

> "* * * Sledge came up and he tried to talk me out of being for the union. He said the future looked bright for me if I would leave it alone."

On February 15, 1965, Walter B. Kissinger, vice-president of the company, delivered a speech to assembled employees. The speech was opened with a recitation of some problems that had been faced and certain accomplishments of the company since its establishment in Bolivar. During this introductory phase the following comment was made:

> "We have plans to build a modern cafeteria for you."

The bulk of the remainder of the speech dealt with the job evaluation and merit rating program which the company planned to implement on March 1, 1965. Finally, the speech closed with an observation by the speaker that the date set for the representation election was approaching and that the company hoped that the employees would see fit to maintain the present relationship. The Board found that the new cafeteria and the job evaluation program constituted benefits to the employees, and that the company had made the announcement with the intent of persuading its employees to vote against union representation.

■ It is axiomatic that the function of the reviewing court in a proceeding of this nature is limited to a review of the record to ascertain whether the findings of the Board are supported by substantial evidence, considering the record as a whole. Sections 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f). Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### Interrogation

■ In our consideration of the Board's findings with respect to interrogation of employees, we start with the premise that not all interrogation is illegal under the Act. NLRB v. Dale Industries, Inc., 355 F.2d 851, 852 (6th Cir. 1966); NLRB v. Flemingsburg Mfg. Co., 300 F.2d 182, 184 (6th Cir. 1962); NLRB v. Tennessee Coach Co., 191 F.2d 546, 555 (6th Cir. 1951). Indeed, all subjects concerning which the employees in the instant case were queried, in a different context have been held permissible.[2]

■ In determining whether interrogation in a specific instance constitutes a prohibited restraint on the employees' protected right of freedom of organization, the frame of reference must include all incidents concerning the organizational effort. The interrogation must be viewed as the employee would have interpreted it, having in mind the total conduct of the employer[3]. What may ordinarily be a harmless inquiry is capable of becoming an unfair labor practice because of attendant circumstances. NLRB v. Zimnox Coal Co., 336 F.2d 516, 517 (6th Cir. 1964); United Fireworks Mfg. Co. v. NLRB, 252 F.2d 428, 430 (6th Cir. 1958); NLRB v. Armco Drainage & Metal Products, Inc., 220 F.2d 573, 583 (6th Cir. 1955). In our opinion, the Board's finding that interrogation under the circumstances present in the instant case violated Section 8(a)(1) of the Act, is supported by substantial evidence.

---

2. In Lincoln Bearing Co. v. NLRB, 311 F. 2d 48, 52 (6th Cir. 1962), the court held that in those circumstances the fact that an employer questioned a least one employee as to how the employee was going to vote in the representation election did not amount to a violation of 8(a)(1) of the Act. The mere asking of an employee if he had signed an authorization card was held not to be a violation of the Act in NLRB v. Dale Industries, Inc., supra, 355 F.2d 851, 853 (6th Cir. 1966).

Still further, it was held in NLRB v. Covington Motor Co., 344 F.2d 136 (4th Cir. 1965), that the act of asking an employee how many employees had signed authorization cards was not a violation of the Act.

3. A discussion of helpful guidelines for ascertaining when interrogation transcends permissible limits may be found in Bourne v. NLRB, 332 F.2d 47, 48 (2nd Cir. 1964).

### Threads

■ The record contains the testimony of several witnesses who testified that they were informed by company supervisors that the plant would move if the union won the election. Credibility of the witnesses is of course a matter for determination by the Board. United Fireworks Mfg. Co. v. NLRB, 252 F.2d 428, 430 (6th Cir. 1958). None of the accused supervisors was called to testify, and thus the damaging testimony stands uncontradicted in the record. In addition, the Board concluded that a part of a speech delivered by the company president could be construed as a threat to the employees of plant closure or a decrease in number of jobs.

■ The Board's finding that these actions on the part of the company constituted illegal threats, is supported by substantial evidence. NLRB v. Tru-Line Metal Products Co., 324 F.2d 614, 616 (6th Cir. 1963), cert. denied 377 U.S. 906, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964); NLRB v. Kingsford, 313 F.2d 826, 832 (6th Cir. 1963).

### Impression of Surveillance

■ In order to appreciate fully the conduct which the Board found created an impression of surveillance, it is necessary to set forth the details with some particularity. The Board's finding was based on the conversation which took place between a foreman and an employee in January, 1965. In pertinent part the conversation was as follows:

"Q Has any boss or foreman ever said anything to you about the union that you can recall?

A Yes.

Q Who was that, ma'am?

A Well, Bob Seerles, for one.

\* \* \* \* \* \*

Q \* \* \* Can you pick up one of the conversations between you and Mr. Seerles about the union?

\* \* \* \* \* \*

A When he first started talking about it, he come to me and said he would like to have, like to talk to me, have a personal conversation.

\* \* \* \* \* \*

A So, he said, 'I would like to ask you why you girls are for the union,' and I said, 'Well, you ask the other girls I can't speak for anybody but myself.' He said, 'I know 90 percent of the assembly is for the union,' and I said, 'Who told you that.'

And he said, 'Oh, we've got ways of knowing. We know everybody that's signed cards.' I said, 'You can't know who has signed cards.' He said, 'Yeah, we've got ways of knowing,' and I said, 'Well, there is no way you can know. You don't know that I signed a card unless I tell you I did.' And he said; 'Oh, yes, I do.' He started naming over girls that he knew had signed cards and I knew that hadn't signed cards. Of course, I didn't tell him either way \* \* \*"

Nowhere does the Board contend that the substance of the above conversation was communicated to her co-worker by the employee. It is clear from an examination of this isolated conversation that the foreman knew very little about who had signed authorization cards, and that the employee was fully aware of this lack of knowledge, and did not believe what he said. It is also obvious from the unrestrained manner in which the employee engaged in the discussion that she was in no way interfered with or coerced by the foreman's remarks. Under these circumstances it can hardly be said that this employee was in any way hampered in the exercise of section 7 rights. The Board's finding to the contrary is not supported by substantial evidence.

### Promises of Benefits

■ Finally, the Board found that the company restrained the employees from free exercise of their rights by promising certain benefits if the employees would reject the union. As pointed out previously, these promises of benefits fell into two categories, the first of which was a specific promise to an individual employee, and the second consisted

of two promises made to the employees as a group. The first promise may be disposed of by saying that credible testimony indicated that a certain employee, who had been active in the organizational campaign, was told by a supervisor that if he would let the union alone the future would look bright for him. This testimony stands uncontradicted by the supervisor to whom it was attributed. The Board's finding that this conduct constituted an unlawful promise of benefits, is supported by substantial evidence.

The second part of the Board's holding as to promised benefits, presents a far more difficult problem. It should be noted that although the Trial Examiner found that the company's conduct with respect to these two programs did not amount to an unfair labor practice, the Board reversed the Examiner on that point [4].

While it is true that the Board is free to take proven facts and to draw inferences therefrom different from those drawn by the Trial Examiner, NLRB v. Wooster Division of Borg-Warner Corp., 236 F.2d 898, 907 (6th Cir. 1956), in cases in which the two differ the Court will more carefully scrutinize the Board's findings. NLRB v. Bin-Dicator Co., 356 F.2d 210, 215–216 (6th Cir. 1966); Burke Golf Equip. Corp. v. NLRB, 284 F.2d 943, 944 (6th Cir. 1960); United Fireworks Mfg. Co. v. NLRB, supra, 252 F.2d 428, 431 (6th Cir. 1958).

The primary thrust of Vice-President Kissinger's speech of February 15, 1965, was to acquaint the employees more fully with the new job evaluation program. The only reference to the building of a cafeteria was a passing one, and the "announcement" comprises ten words in a speech which was approximately seven typewritten pages in length. It appears that prior to the delivery of this speech there had been countless rumors about a cafeteria and "common knowledge in the plant" that one would be built. The company had first considered building the cafeteria in the early part of 1964, and by the middle of 1964 it was actively seeking someone who could run such a facility for it. By Fall of that year plans had progressed to a point where the company had investigated construction costs and had received an estimate from one company. A cafeteria was certainly desirable in view of the fact that although the company employed hundreds of employees, dining facilities in the area of the plant were very limited. By August, 1965, at the time of the hearing before the Trial Examiner, construction of the facility was well under way. As pointed out by the Trial Examiner, this plant was new and was growing. It had had its problems, but since its establishment it had endeavored to improve and make itself more competitive.

The Trial Examiner found that the company had decided to build the cafeteria as an ordinary and proper business decision, and that no motive to dissuade the employees from voting for the union as their bargaining representative, was involved. With that holding we agree. The finding of the Board that the announcement with respect to the cafeteria constituted an unfair labor practice, is not supported by substantial evidence and will not be enforced.

4. Since it is obvious that at least a large number of the company's employees would actually derive benefit from introduction of the evaluation program and the building of the cafeteria, the point upon which the Trial Examiner and the Board differed was the intent or purpose in announcing these programs at that particular time. An unlawful intent may make the granting of a benefit a violation of the provision of the Act. In NLRB v. Exchange Parts Co., 375 U.S. 405, 409,

84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1963) the Court said:
"* * * it [Sec. 8(a) (1)] prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." The burden of proving illegal motivation is on the Board. Quality Castings Co. v. NLRB, 325 F.2d 36 (6th Cir. 1963).

■ The alleged promise of benefits arising out of the job evaluation program stemmed from a letter mailed to all employees on February 12, 1965, and from a speech delivered on February 15, both of which were concerned with explaining the program. It was found by the Examiner, and his finding was not disturbed by the Board, that in a plant the size of Bolivar plant, a program such as was concerned here was essential. In June, 1964, one month after being hired, Kissinger contacted a consulting firm about the possibility of instituting such a program. A representative of the firm visited the company, but due to several difficulties the consulting firm was not engaged. Shortly thereafter the company contacted another consulting firm. In the last days of October the second firm sent a representative to the company, where he prepared job descriptions for the program. This activity was carried on during normal working hours, and much of it was carried on in the presence of the employees.

The program was started in the company's die cast department during December, 1964, at which time the program was explained to all employees of that department. The December issue of the company newspaper announced that a job evaluation survey was being conducted, and stated:

"All the data is now being compiled and all jobs will be rated on a fair and equitable basis. As portions of the program are completed we will move ahead as we have done in the die cast department."

Within forty to fifty days after the program was begun in the die cast department, the entire plant was subject to it.

The Trial Examiner concluded that announcement of the job evaluation program was made in the ordinary course of business and not with a motive of inducing employees to vote against the union. The Trial Examiner found that the announcement was in no way precipitated by the fact that an unfair labor practice charge had been filed against the company earlier or that the holding of a representation election was about to be ordered.

Finally, numerous employees did not in fact receive raises as a result of the evaluation program. The Trial Examiner was of the opinion that the company, by introducing this evaluation program, and at the particular time, " * * * did so in the normal and usual course of business and in a manner consistent with prudent and acceptable business practices."

From the facts as found by the Examiner, the Board found that the introduction of this program had amounted to an unlawful promise of benefits to employees. In our opinion, the Board's decision in this respect is not supported by substantial evidence and will not be enforced.

### The Cease and Desist Order

■ Based on what it said were the numerous violations of the Act, the Board expanded the scope of the remedial order as proposed by the Examiner. But the plant was new. There were no discriminatory layoffs or discharges. Much of what was said was said in connection with an election campaign in which both employer and union have the right of free speech.

Considering the Board's reason for expanding the reach of the order, and the fact that our decision has substantially reinstated the decision of the Trial Examiner, the cease and desist order should be confined in scope as originally proposed by him. Montgomery Ward & Co. v. NLRB, 339 F.2d 889 (6th Cir. 1965).

Except in the respects modified above, the order of the Board is enforced.

EDWARDS, Circuit Judge (concurring in part and dissenting in part.)

I concur with the careful opinion of the court, except for that portion which deals with the pre-election announcement of the job evaluation program.

This announcement (made by letter to each employee on February 12, 1965, and elaborated on at a meeting of all employees on February 15, 1965) was the

first plantwide application of the job evaluation program. It implied a possible take-home pay increase for all who heard it, depending in part on the employee's "attitude." It was made by the company executive vice president to a captive audience of employees on the eve of an NLRB election. In the same speech the executive vice president made clear (as he had a right to do) the company's opposition to the union.

These facts, in my opinion, constituted substantial evidence of interference with these employees' "freedom of choice for or against unionization." N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964).

The Board's finding of this § 8(a) (1) violation seems to me to justify the Board's remedial order as entered, and I would grant enforcement.