393 F.2d 557
 HUGHES & HATCHER, INC. and its Wholly Owned Subsidiary,
Oppenheim's, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
CENTRAL STATES JOINT BOARD, RETAIL & DEPARTMENT STORE
EMPLOYEES, etc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 17412, 17517.
 United States Court of Appeals Sixth Circuit.
 April 17, 1968.
 
 William M. Saxton, Detroit, Mich., Robert J. Battista, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., Lee B. Brody, Smith, Hirsch & Brody, detroit, Mich., on brief, for petitioner Hughes & Hatcher.
 Jacob Sheinkman, New York City, Sheldon Klimist, Detroit, Mich., Bernard J. Firestone, Detroit, Mich., on brief, for petitioner central states Joint Board etc.
 Theodore Sachs, Detroit, Mich., Rothe, Marston Mazey, Sachs & O'Connell, Detroit, Mich., on brief, for intervenor Retail Clerks Unions.
 Julius Rosenbaum, N.L.R.B., Washington, D.C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore, Julius Rosenbaum, Attorneys, N.L.R.B., Washington, D.C., on brief, for respondent.
 Before WEICK, Chief Judge, and O'SULLIVAN and CELEBREZZE, Circuit judges.
 WEICK, Chief Judge.
 
 
 1
 These proceedings involve a bitter controversy between two rival labor unions,[1] each vying to organize the employees of the employer[2] in order to become their bargaining representative.
 
 
 2
 The employer owns and operates a chain of fourteen retail clothing stores in metropolitan Detroit, and through its subsidiary, Oppenheim's, operates two stores in Jackson, Michigan. It employs in all of the stores about eleven hundred employees, three hundred of whom were already represented by a union other than the two here involved.
 
 
 3
 Organizational activity was initiated by Amalgamated in April, 1964, but the company did not become aware of it until the following July. The Company resisted organization of its employees and embarked on a 'Don't Join the Union' campaign and distributed leaflets. Its managers were instructed to watch for union organizers and not to permit solicitation in the stores as it would violate the company's long-standing 'no solicitation' rule. Organizational efforts were originally directed at the two downtown Detroit stores, but by September, 1964, they had spread throughout the chain. In November, 1964, the campaign was slowed because of the union's other organizational commitments and the presence among the company's personnel of numerous seasonal employees. However, in January, 1965, the union assigned top priority to the organization of H&H and designated six full time organizers for the job.
 
 
 4
 In the ensuing months Amalgamated received a more favorable response from general office workers than from other company personnel, and on March 18th the union notified the company, by telegram, that it represented a majority of 'office clerical employees employed in your general offices located at 2301 Woodward Detroit Michigan.' This group was composed of approximately one hundred employees who performed general clerical work for the entire chain. The company rejected the union's request for recognition, and on April 9th the union filed a petition for certification as the bargaining representative for the unit and then called a strike. Approximately forty office workers responded. The strikers, joined by nonemployees, spasmodically picketed all of H&H's stores until May 8th.
 
 
 5
 On April 13th H&H filed an unfair labor practice charge against Amalgamated, claiming that the union was in violation of Section 8(b)(7)(c) of the National Labor Relations Act as amended (29 U.S.C. 151 et seq). The Regional Director dismissed the charge but ordered an expedited election. On April 19th the union filed a petition for certification as the bargaining representative for a unit of approximately eighteen employees, which was said to consist of 'all non-selling employees employed in the Employer's retail store located at 2301 Woodward Avenue Detroit Michigan.' The expedited election was blocked by the filing of an unfair labor practice charge by Amalgamated. The charge was disposed of by a settlement agreement, but the agreement was later set aside and serves as the basis for the present alleged 8(a)(1) violations of unlawful interrogation and a promise of benefits.
 
 
 6
 On May 3rd a representation hearing began. At the hearing the company subscribed to the position that the proper bargaining units should be either all employees in all the company's stores or all non-selling employees in all the company's stores. The next day the hearing was continued at the request of Amalgamated, and was never reconvened.
 
 
 7
 At the suggestion of the company, a meeting was arranged between Bernard E. and Max J. Pincus, president and executive vice-president of H&H, their attorney, Lester Smith, and David Chaney, president of Amalgamated. A sounding out of the positions of each side indicated that the company was greatly concerned about the strike, the picketing, and the injurious effect on its business. On the other hand, Chaney expressed his belief that a majority of the company employees wanted representation by Amalgamated, and that except for the vigorous antiunion campaign waged by H&H, a majority of the employees would have indicated their feelings by signing authorization cards. At another meeting held the next day between the same parties and the attorney for Amalgamated, Chaney boasted that if H&H would clearly state to its employees that in the future it would assume a neutral attitude in regard to organization, Amalgamated could obtain a majority within forty-eight hours. After some negotiation, the parties agreed that H&H would issue a letter informing its employees of its newlyadopted position of neutrality; and that following such letter the employees would be given opportunity to decide whether they wanted the union. Chaney entered into a 'gentlemen's agreement' with Bernard and Max Pincus and their attorney that if a majority of the employees failed to select the union within seventy-two hours, the union would abandon its efforts to organize H&H.
 
 
 8
 A 'neutrality' letter[3] was drafted, and it was agreed that authorization cards would be distributed to employees. There was some disagreement as to how distribution should be carried out. The union wanted its organizers to make the distribution, but H&H objected because it would violate the company's no-solicitation rule. Finally it was agreed that neutral employees would be selected by the store managers to hand out the cards.
 
 
 9
 On the evening of May 4th a meeting of all store managers was held, and the position of the company was explained. The managers were instructed that the neutrality letter should be read the assembled employees, and a copy of it distributed to each employee. Then authorization cards should be distributed. The managers were not told about the seventy-two hour gentlemen's agreement. The only persons who knew about the gentlemen's agreement were Bernard and Max Pincus, Attorney Smith, and David Chaney.
 
 
 10
 The next morning, meetings in conformity with the above format were held in all Detroit stores, on company property and on company time. On May 6th a card check revealed that a majority of employees had selected Amalgamated, on the basis of which the company immediately recognized the union. However, Amalgamated refused to remove picket lines until a contract was negotiated. Bargaining sessions were held on May 6th, 7th and 8th, with the result that on May 8th a union security agreement, running for five years, was executed, and the picketing was discontinued.
 
 
 11
 The foregoing negotiations had not included the Jackson employees. When the union was questioned about what it would want for these employees, it responded that the same terms as had been negotiated would be sufficient. The parties then decided that the same procedure as had been utilized in the Detroit stores, would be employed in the Jackson stores.
 
 
 12
 Accordingly, on May 10th the company's 'letter of neutrality' was read to Jackson employees, and authorization cards were distributed. A subsequent card check revealed that a majority of employees had selected Amalgamated, and the parties thereafter entered into a one-page statement, by the terms of which the Jackson employees were covered by the contract already executed.
 
 
 13
 Retail Clerks had commenced organizational activity shortly before H&H had capitulated to Amalgamated. Retail Clerks filed charges of unfair labor practices against the company, alleging that it gave assistance to Amalgamated in the latter's organization of the employees. The charges were consolidated with those filed by Amalgamated, and a complaint was issued by the General Counsel against the company.
 
 
 14
 The case was heard by the trial examiner, who found that H&H violated Section 8(a)(1) of the Act by interrogating and coercing employees in connection with protected activities, and that it violated Sections 8(a)(1), (2) and (3) of the Act by assisting and contributing financial and other support to Amalgamated, by recognizing and bargaining with Amalgamated, and by entering into a union security agreement at a time when it did not represent an uncoerced majority of the employees. The Board adopted the findings, conclusions and recommended order of the trial examiner, ordered the company to cease and desist from giving effect to the collective bargaining agreements unlawfully entered into with the union, and ordered the company to reimburse the employees for dues and fees exacted under the agreements. The Board added a proviso, however, which expressly reserved to the employees any wage, hour, or other substantial feature of their relationship with their employer which was established pursuant to the agreements, including any rights which they may have thereunder.
 
 
 15
 Petitions to review the Board's order were filed in this court by H&H and Amalgamated. The Board cross-petitioned for enforcement. Retail Clerks' union was granted leave to intervene.
 
 
 16
 Basically there are three broad issues involved. First, did company agents illegally interrogate employees? Second, did the company change its sick-pay policy for antiunion reasons? Third, did the company contribute financial and other support to Amalgamated and interfere with the guaranteed right of its employees to freely select their bargaining representative? The first and second issues involve the charges filed by Amalgamated against the company, and the third one embraces Retail Clerks' charges.
 
 
 17
 * INTERROGATION
 
 
 18
 The Board's opinion with respect to the interrogations is brief and deals with only five out of six hundred employees interviewed by the employer. The Board's holding with respect to interrogation is summarized in the following quotation:
 
 
 19
 'The facts show that in each of the forementioned interviews Respondent illegally interrogated the employees not only as to their own membership in Amalgamated and their sympathies towards it but as to that of other employees and as to the 'leadership' in the union of various named employees. In one such conversation Levine at least impliedly threatened the loss of remuneration to the employees if the Union succeeded, a prognostication which became a reality upon the execution of the contract with Amalgamated, as will be shown later.'
 
 
 20
 It is difficult to discern the exact basis upon which the Board found the interrogations to be illegal. If the Board meant to hold that the mere interrogation as to union membership, without more, was a violation of the Act, then the Board has not correctly applied wellsettled law. Prior cases of this court have held that not all interrogation is illegal under the Act.[4] The Jervis Corp. v. NLRB, 387 F.2d 107, 111 (6th Cir. 1967); NLRB v. Dale Industries, Inc., 355 F.2d 851, 852 (6th Cir. 1966); NLRB v. Flemingsburg Mfg. Co., 300 F.2d 182, 184 (6th Cir. 1962); NLRB v. Tennessee Coach Co., 191 F.2d 546, 555 (6th Cir. 1951).
 
 
 21
 As was pointed out in Jervis Corp., supra, in deciding whether a particular interrogation is a violation of the Act, the questioning must be viewed in the total context of the surrounding circumstances. In order to determine accurately whether the interrogation would reasonably have been coercive, it must be viewed and interpreted as the employee must have understood the questioning and its ramifications. Interrorgation, in order to offend tha Act, must interfere with, restrain or coerce the employees. NLRB v. Welsh Industries, Inc., 385 F.2d 538 (6th Cir. 1967).
 
 
 22
 As the Court observed in NLRB v. Ford, 170 F.2d 735, 738 (6th Cir. 1948), 'the test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act.'
 
 
 23
 The burden of proof rests upon the General Counsel to prove that the interrogation violated the Act. Lawson Milk Co. v. NLRB, 317 F.2d 756, 760 (6th Cir. 1963); and NLRB v. Cleveland Trust Co., 214 F.2d 95, 99 (6th Cir. 1954).
 
 
 24
 In our review of this case we are not unmindful of the fact that our function is limited to ascertaining whether the findings of the Board are supported by substantial evidence, considering the record as a whole. 29 U.S.C. 160(e) and (f). NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, implicit in the phrase 'record as a whole' is the requirement that the court bear in mind that 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' Universal Camera Corp. v. NLRB, supra, at page 488, 71 S.Ct. at page 464.
 
 
 25
 One of the purposes of the interrogations appears to have been to impress upon employees the value of the benefits then being granted by the company, and to point out further how these benefits allegedly exceeded those offered by Amalgamated. In addition, the employee was usually questioned as to how she felt about the union, and often she was asked about the attitudes of her fellow-employees. In one case the employee was asked about employee leadership.
 
 
 26
 Loretta Malik was called into the office of Mr. Kenneth Bertschy, H&H Comptroller, and informed that Mr. Bertschy, wished to talk to her about the union. The employee immediately volunteered the unsolicited response that she had joined the union the day she went to work for H&H. Later in the conversation Mr. Bertschy began to detail some of the benefits presently received by the employees, concerning which the employee testified: '* * * I told him I had been through that, and I understood what was what.' This response turned the conversation to personal maters. Employee Malik further testified that the company official did not threaten her in any way; that he did not urge her to attempt to persuade other employees not to engage in union activity; nor did he in any way threaten discipline or discharge for engaging in union activity.
 
 
 27
 The other conversations were similar in nature. In every instance the employee was apprised of her right to join the union without interference, or fear of reprisal, by the company. As to the instance in which it was found that Mr. Bertschy illegally interrogated Joyce Krotkiewicz, all that appears in the record is that she was called into the office and asked if she had joined the union, and if Loretta Malik was the leader of the employee movement. In March she was interviewed by Mr. David Levine, H&H Director of Training and Personnel Relations. During this conversation Mr. Levine asked her if she had joined the union and what benefits she expected to get from joining. Upon being told that under a union contract certain company benefits would be replaced by benefits negotiated by the union, the employee responded: 'And I told him I didn't care because it (present company benefits) wasn't profitable anyway.' She specifically testified that she was not threatened with the loss of wages or benefits if the union organized the company.
 
 
 28
 In one instance the Board found that an employee had been unlawfully interrogated although the conversation centered entirely upon a comparison of the benefits available under existing company policy as opposed to those obtainable under union plans. No economic coercion was found to be involved. During this interview Mr. Bertschy had prefaced his remarks by informing the employee that he did not want to know how she felt about the union, and that he did not care whether she had signed an authorization card.
 
 
 29
 Under the above circumstances the Board found that the questioning of only five employees, out of the six hundred employees interviewed, constituted unlawful interrogation. A review of the record fails to disclose substantial supporting evidence, and that portion of the Board's order will therefore not be enforced.
 
 II
 BENEFITS
 
 30
 The second issue pertains to the alleged illegal granting of benefits by the company during Amalgamated's organizational campaign. Prior to March 17th, H&H had allotted five sick-leave-days per year to each employee, but unused days were forfeited. On March 17th the company changed its policy, making it retroactive to January 1st, to permit employees to be compensated for unused sick-leave. On several occasions prior to the change, store managers had complained that employees were taking time from work, as sick-leave, during peak selling periods. Absenteeism had been especially high during the previous Christmas season. Shortly before Easter, another peak selling season, the company endeavored to combat this practice by amending its sick-leave policy in the above manner. The Board, noting that the change was announced prior to the union's first demand for recognition, held that cogent business reasons existed for the change, and that the change was in no way motivated by anti-union feelings. The reasoning of the Board is persuasive, and in our opinion its findings and order with respect thereto are supported by substantial evidence, and will not be disturbed.
 
 III
 
 31
 COMPANY ASSISTANCE IN AMALGAMATED'S ORGANIZATIONAL EFFORTS
 
 
 32
 The third issue relates to the conduct of the company between May 4th and 8th, and after it capitulated and got together with Amalgamated in an effort to expedite a settlement of the controversy in which they were embroiled.
 
 
 33
 The essence of the Board's holding in this facet of the case is that the company violated Section 8(a)(1) of the Act, first, by threatening its employees with unemployment if they did not join Amalgamated; and second, by not disclosing to its employees material facts bearing on their decision whether to select Amalgamated as their bargaining representative. This conduct, coupled with the acts of the company in using its personnel to address the employees on company time and on company property, and in having its own employees pass out the authorization cards to employees on company property during working hours, was held by the Board to constitute unlawful assistance to the union in violation of Section 8(a)(2) of the Act. If the above violations are established, then the five-year union security agreement would be illegal.
 
 
 34
 There are present in this case a number of incidents and occurrences which, if considered alone, might lead to the exoneration of the employer, but when considered together require the conclusion that H&H interfered with its employees in the unfettered exercise of their rights protected under Section 7 of the Act. It is unnecessary to detail all of the numerous instances which point toward this result since a few examples will substantiate the violation.
 
 
 35
 The first matter to be considered is the 'neutrality' letter, quoted earlier. It must be noted that the Act contemplates a certain degree of freedom of expression by the parties in an organizational campaign. NLRB v. United Steelworkers, etc., 357 U.S. 357, 362, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). However, this right is not unqualified, and as this court said in NLRB v. Peterson, 157 F.2d 514, 515 (6th Cir. 1946):
 
 
 36
 'If they (statements) are couched in such phrases, or attended by such circumstances that they tend to exercise undue influence and coercion upon the employees, the expressions of opinion are not protected.'
 
 
 37
 See also NLRB v. Kingsford, 313 F.2d 826, 832 (6th Cir. 1963); and NLRB v. Ford, 170 F.2d 735 (6th Cir. 1948).
 
 
 38
 The company and Amalgamated rely upon the decisions of Local 1325, Retail Clerks Int'l Ass'n, etc. v. NLRB, 325 F.2d 293 (1st Cir. 1963) and Gem Int'l, Inc. v. NLRB, 321 F.2d 626 (8th Cir. 1963). It is true that one of the cases is in material respects similar to the instant case, but neither is dispositive. As a matter of fact, the only issue discussed in Local 1325 is the disparate treatment of different unions by the employer. The opinion does not even allude to the more basic problem of individual rights, which is presented here.
 
 
 39
 The entire tenor of the neutrality letter suggests the following conclusions: First, the strike and the picketing are hurting the company's business; second, the company has fought the union but it is no longer able to do so; and third, there is no foreseeable end to the dispute. This letter did not contain express threats, but by indicating no foreseeable end to the dispute, it appears to conflict with the undisclosed gentlemen's agreement. When viewed in the light of surrounding facts and circumstances, it could be treated as assisting Amalgamated in its organizational efforts.
 
 
 40
 The exact form of the store meetings held on May 5th varied. They were all held on company property, during working hours. In some cases the managers merely read the letter to the employees, passed out copies, and arranged for distribution of authorization cards. However in several of the meetings the procedure was supplemented by oral explanations. For example, Mr. Levine conducted the meeting of general office workers. He told the employees that the company had reached this decision reluctantly, but business was down approximately thirty per cent, and in view of the fact that still another union was trying to get in, there was a possibility of fragmentation, which could mean that the picketing might last a year or more; that this seemed to be the only way to remove the pickets; that delay might result in layoffs; and that the authorization cards were to be signed as soon as possible.
 
 
 41
 One manager, according to his own testimony, told the employees by way of amplification of the letter:
 
 
 42
 '* * * We realized we were hurting, we were losing business because of the picketing, the sales people were already feeling the pinch a little bit, in the pocket book, that as explained that the law which permitted fragmentation made possible we could have a picket line for a number of years and the solution to it was to get that picket line away from there. * * * We could allow the union to try and get them to sign cards, and if they did enough sign, they would have the union and the picket line would be gone, and if not go on from there.' This same manager told one of the employees who had been selected by him to pass out cards: '* * * The company was losing the fight with the union, and that they would eventually go out of business if they kept fighting the union because they were losing something like one-third of the business.'
 
 
 43
 The employee was told to repeat this message as he passed out cards.
 
 
 44
 At another store an employee was selected to pass out cards, but on the second day the assistant manager assumed the duty, giving as a reason the fact that the employee had not been successful in obtaining signatures. At a meeting of assembled employees in one of the Jackson stores, Mr. Levine told the employees that they did not have to sign authorization cards, but if a majority did not do so, the picketing would in all probability continue, and in two years H&H would be out of business. Other store managers also linked the removal of the picket lines with the signing of authorization cards.
 
 
 45
 Throughout the period in question, company personnel constantly impressed upom employees the fact that if they did not sign authorization cards the picketing would continue, and that the company might have to go out of business as the ultimate result of such activity. Furthermore, the company and the union did not disclose to employees the fact that regardless of the outcome of the union membership drive, the matter would be settled within seventy-two hours. Company personnel either expressly said or intimated that if the employees did not sign cards, the union might picket the company for as long as two years.
 
 
 46
 The Board felt that this left the employees with the following choice:
 
 
 47
 '(1) If the employees signed the cards, then, of course, Amalgamated would remove its picket line so that Respondent's (H&H's) business and the employees' jobs would be saved, or
 
 
 48
 (2) On the other hand, if the employees failed to sign the cards, then apparently (due to concealment) the picket line would continue as before with the foreseeable result (implied in the neutrality letter and explicated at a number of the store meetings) that Respondent's (H&H's) business would be so seriously affected thereby as to result in layoffs or in the closing of the business entirely, i.e. ultimate unemployment for the employees.'
 
 
 49
 As noted previously, the indefinite nature of the picketing was constantly emphasized. In acting as it did, H&H created, in cooperation with Amalgamated, an atmosphere in which its employees thought they were faced with the alternative of either signing authorization cards or facing indefinite picketing. This actually did not reflect the true facts.
 
 
 50
 Also, a five-year representation agreement was entered into providing for a wage increase and check-off of dues, but with no provision for wage reopening, except for wage adjustments under the Federal Wage and Hour Law. This agreement was not submitted to the employees for approval.
 
 
 51
 It is significant that prior to H&H's capitulation, Amalgamated, over a long period of time, had succeeded in obtaining less than one hundred authorization cards from more than eight hundred employees, but in only two days of assistance from H&H, four hundred seventy-two employees, in fourteen stores, signed cards.
 
 
 52
 The Act contemplates that employees, in the selection of their bargaining representative, shall have 'complete and unfettered freedom of choice.' NLRB v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368 (1941). On page 599, 61 S.Ct. on page 366 the court said:
 
 
 53
 'If the words or deeds of the supervisory employees, taken in their setting, were reasonably likely to have restrained the employees' choice and if the employer may fairly be said to have been responsible for them, they are a proper basis for the conclusion that the employer did interfere * * * The fact that these various forces at work were subtle rather than direct does not mean that they were nonetheless effective. Intimations of an employer's preference, though subtle, may be as potent as outright threats of discharge.'
 
 
 54
 In International Ass'n of Machinists, etc. v. NLRB, 311 U.S. 72 at page 78, 61 S.Ct. 83, at page 88, 85 L.Ed. 50 (1940), the court said:
 
 
 55
 'Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure.'
 
 
 56
 At page 80, 61 S.Ct. at page 88 the court further said:
 
 
 57
 'Thus where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates. Here there was ample evidence to support that inference.'
 
 
 58
 See also International Ladies' Garment Workers, etc. v. NLRB, 366 U.S. 731, 737-739, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).
 
 
 59
 The participation of management and employees in the solicitation of signed cards on company time and property, deprived the authorizations of voluntariness, which the law requires. NLRB v. Heck's Inc., 387 F.2d 65 (4th Cir. 1967); NLRB v. Malcolm Konner Chevrolet, Inc., 338 F.2d 972 (3rd Cir. 1964); NLRB v. Fiore Bros. Oil Co., 317 F.2d 710 (2nd Cir. 1963).
 
 
 60
 The views we have expressed apply with equal force to the solicitation of signed cards at the stores of Oppenheim's located at Jackson, and to the agreement to adopt the H&H union security agreement.
 
 
 61
 In our opinion the Board's order with respect to the third issue is supported by substantial evidence and will be enforced.
 
 IV
 RESTITUTION
 
 62
 One other matter remains, and that is the Board's order requiring H&H to make restitution to its employees of the initiation fees and dues paid by its employees under the checkoff provisions of the bargaining agreement, and the proviso in the order which attempted to preserve the rights of employees against the employer under the illegal agreements.
 
 
 63
 Retail Clerks asserts in its brief that these moneys are held in escrow by H&H to await the decision of this court. Amalgamated states in its brief that the moneys were paid to it. The record does not disclose the facts.
 
 
 64
 If H&H is holding the moneys in escrow to await the decision of this court, there will be no problem, as it can make distribution in accordance with the Board's order. If H&H has paid the moneys to Amalgamated, then the Board's order should be directed against that union and not against H&H, which acted merely as a conduit for the funds, and there is no reason why it should be penalized. Amalgamated violated the Act just as well as H&H, and if it received the money it should refund the same.
 
 
 65
 The Board could have filed a complaint alleging unfair labor practice charges against Amalgamated, but did not do so. In any event, if the union security agreements are illegal, as the Board has found, no party to the agreements, including the employee-beneficiaries, can enforce them against the company.
 
 
 66
 Enforcement granted in part, as provided in this opinion.
 
 
 
 [1]
 Central States Joint Board, Retail & Department Store Employees, Amalgamated Clothing Workers of America, AFL-CIO, and Retail Store Employees Unions, Locals Nos. 876 and 36, RCIA, AFL-CIO. They will be referred to as Amalgamated and Retail Clerks, respectively
 
 
 [2]
 Hughes & Hatcher, Inc. and its wholly owned subsidiary, Oppenheim's, Inc., referred to herein as H&H, employer, or company
 
 
 [3]
 May 4, 1965
 'To the Employees of Hughes Hatcher Suffrin:
 Strikes and picketing never help a business and the continuance without an end in sight of the existing situation must hurt the company, our customers and our employees.
 For some time now, the Retail and Department Store Employees' Union, Amalgamated Clothing Workers of America, has been soliciting you and other employees to join their union. Your company opposed this solicitation.
 During this period, there were many differences of opinion between your company and the union which resulted in strife and unrest which has affected all of our employees. This is not abnormal under this type of situation, however, the purpose of the company is to sell merchandise and to service its customers and not to engage in labor warfare.
 We appreciate very much your loyalty to the company, but after much thought and consultation and with no foreseeable end to the dispute, we have come to the inevitable conclusion that for the benefit of our employees and customers and our company, this strife should end as quickly as possible and business returned to a normal basis.
 The company is willing to recognize the union after the union has had an opportunity to freely solicit our employees and obtain a proper showing of interest.
 When a majority of our employees sign these union membership cards, it then becomes established that they recognize the union as their legally appointed bargaining agent.
 The company will not interfere with the union's solicitation of membership and the company will not look unfavorably upon any employee who signs a card for the union.
 HUGHES HATCHER SUFFRIN (s) Bernard E. Pincus Bernard E. Pincus, President (s) Max J. Pincus Max J. Pincus, Executive Vice President'
 
 
 [4]
 Interrogation of employees concerning their membership in the union, membership of fellow-employees, or the general activity of the union, absent interference or coercion, does not violate the Act. See e.g., NLRB v. Covington Motor Co., 344 F.2d 136, 137 (4th Cir. 1965); Federation of Union Representatives v. NLRB, 339 F.2d 126, 130-131 (2nd Cir. 1964); Lincoln Bearing Co. v. NLRB, 311 F.2d 48, 51 (6th Cir. 1962); United Fireworks Mfg. Co. v. NLRB, 252 F.2d 428, 430 (6th Cir. 1958)